805 F.2d 682
 55 USLW 2270, 6 Fed.R.Serv.3d 155,
7 Employee Benefits Ca 2442
 SECRETARY OF LABOR, Plaintiff-Appellant,
v.
Frank E. FITZSIMMONS, et al., Defendants-Appellees.
David DUTCHAK, et al., Plaintiffs-Appellees,
and
Secretary of Labor, Intervening Plaintiff-Appellant,
v.
INTERNATIONAL BROTHERHOOD OF TEAMSTERS, etc., et al.,
Defendants-Appellees.
Chester SULLIVAN, et al., Plaintiffs-Appellees,
and
Secretary of Labor, Intervening Plaintiff-Appellant,
v.
ESTATE OF Frank E. FITZSIMMONS, et al., Defendants-Appellees.
 Nos. 84-2827, 84-2863 and 84-2864.
 United States Court of Appeals,
Seventh Circuit.
 Argued June 9, 1986.
Decided Oct. 30, 1986.*
As Amended Dec. 22, 1986.
 
 Steven J. Mandel, U.S. Dept. of Labor, Washington, D.C., (Allen H. Feldman, on brief), for plaintiff-appellant.
 Robert J. Higgins, Dickstein, Shapiro & Morin, Washington, D.C., Edmund W. Kitch, School of Law, Univ. of Virginia, Charlottesville, Va., for defendants-appellees.
 Before BAUER, Chief Judge, CUMMINGS, CUDAHY, POSNER, COFFEY, EASTERBROOK and RIPPLE, Circuit Judges.
 COFFEY, Circuit Judge.
 
 
 1
 In Donovan v. Fitzsimmons, 778 F.2d 298 (7th Cir.1985), a panel of this court affirmed an order of the district court approving the settlement of actions brought by participants in the Central States Southeast and Southwest Areas Pension Fund (CSPF) against the various named defendants alleging that the benefit eligibility rules for pension payments were arbitrary, unreasonably restrictive and further, that the trustees had mismanaged the Funds' assets. We granted the Secretary of Labor's petition for rehearing en banc to consider whether the district court properly dismissed the Secretary's action on the grounds that his claim was barred by the doctrine of res judicata. We vacate the order of the district court and remand this case for further consideration in light of our holding herein.
 
 I. BACKGROUND
 
 2
 This case has a complex history dating back to the middle 1970's when aggrieved members of the International Brotherhood of Teamsters Union initially filed various actions against their pension fund known as the Central States Pension Fund, the CSPF's former trustees and the IBT. The initial suit was a class action, Dutchak, et al. v. International Brotherhood of Teamsters, et al. ("Dutchak"), filed on behalf of individual Teamster members against the IBT and the CSPF in 1976 alleging that the benefit eligibility rules for pension payments were arbitrary and unreasonably restrictive and further that the trustees had mismanaged the Fund's assets. In the aftermath of the Department of Labor investigation concerning the alleged mismanagement of the Central States Pension Fund, the DOL filed a separate action against the former trustees of the CSPF, Donovan v. Fitzsimmons, et al., in 1975 and alleged that the former trustees had mismanaged the pension fund, in violation of 29 U.S.C. Sec. 1104.[1] The DOL claimed the alleged mismanagement caused losses of between $50 to $70 million due to imprudent loans and improper investments in various real estate syndicates, hotels, including gambling casinos in Las Vegas, and other businesses.[2] After the DOL filed the Donovan action, the named plaintiffs in Dutchak requested leave to file an amended complaint with the court essentially incorporating most of the claimed fiduciary duty violations under ERISA set forth in the Donovan complaint; however, the district court did not rule on this motion. Thereafter, in 1979 the attorneys representing the plaintiffs in Dutchak filed a class action, Sullivan, et al. v. Fitzsimmons, et al., incorporating all of the allegations set forth in the previous Donovan and Dutchak complaints. In 1979, the court ordered the three cases consolidated for purposes of discovery.
 
 
 3
 On October 16, 1981, a proposed settlement was reached between the private plaintiffs in the Dutchak and Sullivan actions and the Central States Pension Fund and Teamsters Union resolving the benefit claims. According to the terms of the proposed settlement the CSPF agreed to substantially liberalize the rules governing the eligibility for pension benefits. The plaintiffs and the CSPF projected that the liberalized rules governing eligibility for pension benefits would require approximately $140 million be set aside for the additional participants who might now qualify for pension benefits under the proposed settlement. The proposed settlement between the private plaintiffs and the Central States Pension Fund also conditioned the final settlement upon the resolution of the asset mismanagement claims and the dismissal of the DOL's Donovan action. During the period of these settlement negotiations between the named plaintiffs and the CSPF and IBT, the Department of Labor was not informed that these parties were discussing settlement of the Secretary's action in Donovan, and thus the Secretary had no knowledge of, and was not a party to, any of these negotiations. In fact, as counsel for the named plaintiffs disclosed during the October 21, 1981 hearing, the CSPF directed the plaintiffs not to discuss the settlement negotiations with the Secretary of Labor: "Now as a condition of the negotiations, we were required [by the CSPF] not to communicate with the Department of Labor about this activity or the contents...."[3] (Emphasis added). Subsequently, in November 1981, after the Secretary of Labor became aware of this highly unusual secrecy requirement as pertaining to him, the DOL moved to intervene as a plaintiff in the Sullivan and Dutchak class actions, pursuant to its right of intervention under 29 U.S.C. Sec. 1132(h).[4] The Court granted the Secretary's motion to intervene for the limited purpose of objecting to the proposed settlement and participating in any settlement hearings.
 
 
 4
 On June 13, 1984 the final settlement agreement between the plaintiffs and the defendants was filed with the court, incorporating an Insurance Settlement Agreement providing that the CSPF's former trustee's insurance companies, Aetna and Lloyds of London, would pay $2 million to the CSPF in settlement of the asset mismanagement claims against the former trustees. The insurance companies agreed to pay the $2 million only if the former trustees agreed to release the respective insurance companies from any further liability[5] (Department of Labor's Appendix at 189-90), and settlement was also conditioned on the discharge from liability of the defendants in each action.
 
 
 5
 Between the time that the DOL intervened in the Sullivan and Dutchak action and the filing of the settlement agreement between the private plaintiffs and the defendants in June 1984, the Secretary did participate in the class actions in a very limited manner only as to the filing of memoranda with the court urging that the class not be certified since the named plaintiffs could not properly and adequately represent the asset mismanagement group's interests. In conjunction therewith and at the suggestion of the court, the Secretary of Labor filed a memorandum with the court addressing the nature and scope of the notice to be provided to the proposed class. In the spring of 1984, a notice was sent to all proposed class members (the benefit group and the asset mismanagement group) disclosing the terms of the settlement. The district court also permitted the Secretary of Labor to send an accompanying letter to the class urging rejection of the settlement.
 
 
 6
 On June 13, 1984, the district court held a hearing to review the terms of the settlement. During this hearing, the Secretary of Labor objected to the settlement of the asset mismanagement claims, contending that the anticipated recovery was wholly inadequate in light of the number and dollar amount of the claims against the former trustees and also that the settlement agreement failed to allow recovery from the personal assets of the former trustees. Some two and one-half months later, on August 27, 1984, the court issued its written findings and certified as one class "all persons on whose behalf a contribution has been made or required to be made" for purposes of approval of the settlement. This class consisted of all the benefit and asset mismanagement unnamed plaintiffs. The Department of Labor has continually contested the ability, authority and propriety of the named plaintiffs to represent both the benefit and asset mismanagement unnamed plaintiffs; however, the court disagreed and found that the unnamed plaintiffs were adequately represented under Fed.R.Civ.P. 23(a)(4) which requires that "the representative parties ... fairly and adequately protect the interests of the class." In reaching its conclusion that Fed.R.Civ.P. 23(a)(4) was satisfied, the court determined that the DOL had adequately represented the interest of those members of the class who sought a larger recovery for the asset mismanagement claims, and also that the defendant CSPF had adequately represented the interests of those members of the class who sought to limit the liberalization of eligibility rules governing benefits.
 
 
 7
 The court further determined that since the settlement had been presented to the court as a package, the entire settlement "must stand or fall as a package." The court after reviewing the settlement concluded that the settlement was fair and reasonable. To support its decision the court found that all parties had an opportunity to litigate the contested issues and that the $2 million to be received from the insurance companies was the largest amount attainable under the circumstances,[6] and that the cost of further litigation in this case outweighed the benefits to be gained. In approving the settlement, the court also ruled that there was no reason to believe that any of the former trustees were likely to commit ERISA violations in the future since they were not now serving on the CSPF board and a consent decree had been entered providing for special counsel to overlook future management of the Fund.[7] The court next addressed the issue of the continued viability of the Secretary's action in Donovan and determined that since there was a "congruence of legal interests" between the DOL and the private plaintiffs, privity existed between the parties for purposes of applying the doctrine of res judicata to bar the Secretary's action in Donovan, finding that the Secretary of Labor was bound by the settlement agreement since he had intervened in the class action. The court dismissed the Sullivan, Dutchak and Donovan actions.
 
 
 8
 On appeal, a split panel of this court affirmed the trial court's approval of the settlement agreement. With the granting of the Secretary of Labor's petition for rehearing en banc, we vacated the decision of the original panel. We now reverse the decision of the district court, and remand for further proceedings in light of our holding.
 
 II. RES JUDICATA AND LIMITED INTERVENTION
 
 9
 On appeal, the DOL's primary contention is that the district court misapplied the doctrine of res judicata in finding that the DOL was in privity with the private plaintiffs in this action. The defendants argued to this court that the DOL acts merely as a representative of the interests of the beneficiaries of the fund. The DOL, however, contends that its interest in this litigation is much broader, encompassing its obligation to protect the interests of the general public, including the reinforcement of public confidence in a private pension system that involves billions of dollars in assets and investments that affect not only the entire United States economy but also the United States Tresury, as well as supervising the enforcement of the ERISA statute. Thus, the basic issue in this case is whether the DOL has an "interest" separate and distinct from that of the private plaintiffs or any private plaintiff for purposes of determining whether privity exists between the DOL and the private plaintiffs in Dutchak and Sullivan, and whether the Secretary's very limited intervention in this case precludes the Secretary from avoiding the effects of res judicata.
 
 
 10
 The Dutchak and Sullivan cases are private class actions joining all beneficiaries and potential beneficiaries of the pension fund. The district court certified this case as a class action, after proper notice had been given to all potential class members, as "consisting of all persons on whose behalf a contribution has been made or was required to be made ..." to the CSPF. The trial court also determined that the Secretary was in privity with the private class action plaintiffs for purposes of res judicata.[8]
 
 
 11
 "Under res judicata, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." Allen v. McCurry, 449 U.S. 90, 94, 101 S.Ct. 411, 414, 66 L.Ed.2d 308 (1980). In order for the doctrine of res judicata to apply there must be (1) a final judgment on the merits, (2) an identity of the cause of action between the two actions, and (3) an identity of parties or their privies in the two actions. Lee v. City of Peoria, 685 F.2d 196, 199 (7th Cir.1982); Church of the New Song v. Establishment of Religion, 620 F.2d 648, 652 (7th Cir.1980), cert. denied, 450 U.S. 929, 101 S.Ct. 1387, 67 L.Ed.2d 361 (1981). See also 1B Moore's Federal Practice p 0.410 and 0.411. Privity between parties is established where those parties' interests are so closely aligned that they represent the same legal interests. See Southwest Airlines Co. v. Texas Int'l Airlines, Inc., 546 F.2d 84, 95 (5th Cir.), cert. denied, 434 U.S. 832, 98 S.Ct. 117, 54 L.Ed.2d 93 (1977).[9]
 
 
 12
 In this case, the trial court found that there was an identity of the cause of action between the Secretary of Labor in Donovan and the private plaintiffs in Sullivan and Dutchak since their respective claims were based upon the same operative facts (trustees' violations of their fiduciary duties to the funds in asset management transactions) and alleged statutory violations (Sec. 302 of the National Labor Relations Act, 29 U.S.C. Sec. 186 and Sec. 404 of ERISA, 29 U.S.C. Sec. 1104). The DOL does not contest this finding before this court. The district court also found that privity was established between the Secretary of Labor and the private parties since:
 
 
 13
 "(1) there is a 'congruence of legal interest' between the Secretary and the private plaintiffs, (2) the private plaintiffs have adequately represented the Secretary's interests, and (3) the relationship between the private plaintiffs and the Secretary is 'sufficiently close' due to the identity of their interests under ERISA. Southwest Airlines Co. v. Texas International Airlines, 546 F.2d 84, 102 (5th Cir.), cert. denied, 434 U.S. 832, 98 S.Ct. 117, 54 L.Ed.2d 93 (1977)."
 
 
 14
 The court, having determined that Sullivan and Donovan involved the same claims and that the DOL and private plaintiffs shared similar interests, and thus were in privity, found that the doctrine of res judicata barred further litigation in the Donovan action. Further, the court concluded that, although the DOL originally intervened in the Sullivan action "for the limited purpose of: (1) expressing the Secretary's views regarding the appropriateness and adequacy of the proposed settlement; and (2) participating in the contemplated settlement hearings ...,"[10] the Secretary of Labor had been a "full participant in the settlement process" and thus was "bound to the extent of his own intervention." District court's Findings of Fact and Conclusions of Law at 22-25 (August 27, 1984).
 
 A. The Parties' Interests
 
 15
 Whether or not the doctrine of res judicata applies in this case depends upon the statutory role of the DOL in bringing an ERISA action. Thus, the question of whether or not privity exists between the DOL and the private plaintiffs is a question of law subject to a review de novo on appeal. See Southwest Airlines Co., 546 F.2d at 95 ("the term privity ... represents a legal conclusion that the relationship between the one who is a party ... and the non-party is sufficiently close to afford application of the principle of preclusion") (quoting Vestal, Preclusion/Res Judicata Variables: Parties, 50 Iowa L.Rev. 27 (1964)). Initially we turn to the legislative history of ERISA to determine the primary interest and obligation of the Secretary of Labor in enforcing the ERISA laws.
 
 
 16
 History recounts that prior to the enactment of ERISA, federal involvement in the monitoring of pension funds in this country was minimal. Because of the growth of private pension plans and the problems concurrent therewith, Congress in 1958 expanded the government's role in supervising and monitoring pension plans with the enactment of the Welfare and Pension Claim Disclosure Act; however, this Act provided only limited disclosure of information and filing of reports for the pension funds. See Hutchinson and Ifshin, Federal Preemption Under The Employee Retirement Income Security Act of 1974, 46 U.Chi.L.Rev. 23, 28 (1978). Under this monitoring system, the primary responsibility for supervising the pension funds was left to the beneficiaries, "reserving to the states the detailed regulations relating to insurance and trusts...." Id. citing H.R.Rep. No. 2283 reprinted in [1958] U.S.Code Cong. & Ad.News 4137, 4181, at 4187. ERISA was enacted by Congress in 1974 after determining that the then present system of regulation was ineffective in monitoring and preventing fraud and other pension fund abuses.
 
 
 17
 "Experience ... has demonstrated the inadequacy of the Welfare and Pension Plans Disclosure Act in regulating the private pension system. It is weak in its limited disclosure requirements and wholly lacking in substantive fiduciary standards. Its chief procedural weakness can be found in its reliance upon the initiative of the individual employee to police the management of his plan."
 
 
 18
 S.Rep. No. 1150, 92d Cong., 2d Sess. 5 (1972), cited in Hutchinson, supra. See also H.R.Rep. No. 93-533, 93d Cong., 1st Sess. 17 (1973), reprinted in [1974] U.S.Code Cong. & Ad.News 4639, 4655. Congress determined this problem to be national in scope warranting the federal government's intervention in order that they might safeguard the national interest in the private pension fund system and the beneficiary's interest in a retirement income.
 
 
 19
 "Sec. 1001. Congressional findings and declaration of policy
 
 
 20
 (a) The Congress finds that the growth in size, scope, and numbers of employee benefit plans in recent years has been rapid and substantial; that the operational scope and economic impact of such plans is increasingly interstate; that the continued well-being and security of millions of employees and their dependents are directly affected by these plans; that they are affected with a national public interest; that they have become an important factor affecting the stability of employment and the successful development of industrial relations; that they have become an important factor in commerce because of the interstate character of their activities, and of the activities of their participants, and the employers, employee information and adequate safeguards concerning their operation, it is desirable in the interests of employees and their beneficiaries, and to provide for the general welfare and the free flow of commerce, that disclosure be made and safeguards be provided with respect to the establishment, operation, and administration of such plans; that they substantially affect the revenues of the United States because they are afforded preferential Federal tax treatment; that despite the enormous growth in such plans many employees with long years of employment are losing anticipated retirement benefits owing to the lack of vesting provisions in such plans; that owing to the inadequacy of current minimum standards, the soundness and stability of plans with respect to adequate funds to pay promised benefits may be endangered; that owing to the termination of plans before requisite funds have been accumulated, employees and their beneficiaries have been deprived of anticipated benefits; and that it is therefore desirable in the interests of employees and their beneficiaries, for the protection of the revenue of the United States, and to provide for the free flow of commerce, that minimum standards be provided assuring the equitable character of such plans and their financial soundness."
 
 
 21
 29 U.S.C. Sec. 1001(a) (emphasis added). ERISA's statement of purpose makes it clear that Congress was aware of the public's proper concern that these pension plans receive adequate supervision and monitoring, and was also concerned with the potential effect these plans might have on interstate commerce and the public treasury. Specifically, Congress recognized that the economic impact of private plans was interstate, that the plans affected the national public interest in employment stability and industrial relations, and that because they substantially affect the very revenues of the United States and affect the free flow of commerce to the general welfare, private plans are afforded preferential tax treatment.
 
 
 22
 To accomplish the desired remedial and protective purposes of ERISA, Congress required that all assets of the employee benefit plans "be held in trust by one or more trustees," 29 U.S.C. 1103(a), subject to comprehensive standards of conduct wherein a fiduciary or trustee must discharge his duties solely in the interests of the participants "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters were to use...." 29 U.S.C. Sec. 1104(a). The Congressional enactment further directed that the fiduciary might very well be held to be "personally liable to make good to such plan any losses to the plan resulting from each such breach ..." of his fiduciary duty, 29 U.S.C. 1109(a), and the civil action to recover the losses caused by the fiduciary's breach of duty could be brought by the "Secretary, or by a participant [in a pension plan]...." 29 U.S.C. Sec. 1132(a)(2). Moreover, Congress provided that "a copy of the complaint in any action under this subchapter by a participant, beneficiary, or fiduciary ... shall be served upon the Secretary ..." and that the Secretary "shall have the right in his discretion to intervene in any action [brought by a participant, beneficiary or fiduciary]...." 29 U.S.C. Sec. 1132(h). But nothing in the statute or its legislative history equates the Secretary's interests with those of private litigants so as to justify the application of res judicata to bar the Secretary from bringing a separate claim where private litigation has begun or been concluded.
 
 
 23
 The defendants argue that the Secretary of Labor is in privity with the private litigants and therefore the doctrine of res judicata applies. The defendants contend that in including this right to intervene in the ERISA statutory scheme, Congress intended that the Secretary could exercise his option to intervene in the private litigation once he determined that intervention was in the best interests of the participants. Thus the defendants sum up their argument by stating the Secretary's only interest in this litigation is to represent the interests of the beneficiaries and plan participants alone. We disagree with the defendants' restrictive interpretation of the Secretary's role which is in direct contradiction of the legislative history and statutory scheme of ERISA. The congressional findings and declaration of policy recited above clearly indicate that Congress was not only concerned about the welfare of individual beneficiaries but was equally concerned with the impact of employee benefit plans on the stability of employment, the successful development of industrial relations, the revenues of the United States, the free flow of commerce, and the general welfare of the nation.[11] 29 U.S.C. Sec. 1001. An examination of the statutory scheme makes it eminently clear that the Secretary and the Secretary alone may bring a suit to collect a civil penalty for violations of Sec. 1106 (prohibited transactions). Indeed, the Secretary of Labor is responsible for detecting, investigating, and monitoring civil and criminal violations of ERISA and referring those cases to the Attorney General for prosecution where he believes violations exist.
 
 
 24
 Although Congress gave the Secretary of Labor the responsibility and authority to investigate and monitor employee benefit plans, it never mandated that the Secretary must intervene in each and every piece of litigation or forever be barred by the doctrine of res judicata. Congress in giving the Secretary of Labor the authority to intervene in private actions of this nature furthered its original intent to aid the DOL in promoting uniformity of law, and further, in order that it might protect beneficiaries in general, who all too often suffer as a result of ill-advised decisions that arise from the mishandling of a case by a private litigant. See H.R.Rep. No. 95-533 reprinted in 1974 U.S.Code Cong. and Ad.News 4639, 4650. Cf. United States v. Mendoza, 464 U.S. 568, 104 S.Ct. 568, 572-73, 78 L.Ed.2d 379 (1984); United States v. East Baton Rouge Sch. Bd., 594 F.2d 56, 58 (5th Cir.1979) (Voting Rights Act). Thus, Congress facilitated the Secretary's ability to monitor ERISA compliance in mandating service of all complaints on the Secretary in actions brought under ERISA, and in allowing the Secretary to intervene in private actions. But the requirement that notice be given to the Secretary does not establish that Congress intended the Secretary's interest to be identical to that of a private litigant so as to bar the Secretary under the doctrine of res judicata from litigating his own claim independently of a private litigant. To hold that res judicata bars the Secretary from independently pursuing enforcement of ERISA would effectively limit the authority of the Secretary under ERISA. In the absence of an explicit legislative directive that the Secretary's authority should be so limited, this Court will not presume that Congress intended res judicata to bar independent action by the Secretary.[12]B. The Secretary is Not Barred by Private Litigation
 
 
 25
 The Government is not barred by the doctrine of res judicata from maintaining independent actions asking courts to enforce federal statutes implicating both public and private interests merely because independent private litigation has also been commenced or concluded. For example, the Voting Rights Act protects the public interest in the "due observance of all constitutional guarantees" and the individual's right to vote. See East Baton Rouge, 594 F.2d at 58, quoting United States v. Raines, 362 U.S. 17, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960). The Supreme Court has held that the Attorney General "is not bound by the resolution of Sec. 5 [Voting Rights Act] issues in cases to which he was not a party." Hathorn v. Lovorn, 457 U.S. 255, 268 n. 23, 102 S.Ct. 2421, 2429, 72 L.Ed.2d 824 (1983); City of Richmond v. United States, 422 U.S. 358, 373-74 n. 6, 95 S.Ct. 2296, 2305, 45 L.Ed.2d 245 (1975) ("whatever the merits of the District Court's position on this collateral estoppel issue, we find controlling the nonparticipation of the United States ... in the Holt I case"). See also United States v. East Baton Rouge Parish School Board, 594 F.2d 56, 58 (5th Cir.1979) (Voting Rights Act). Similarly, in Title VII actions the government is not bound by previous litigation involving private parties. New Orleans S.S. Ass'n v. E.E.O.C., 680 F.2d 23, 25 (5th Cir.1982) ("EEOC may challenge a transaction which was the subject of prior judicial scrutiny in a private suit, if the subsequent challenge seeks different relief"); E.E.O.C. v. North Hill Passavant Hosp., 544 F.2d 664, 672 (3d Cir.1976) (Title VII); E.E.O.C. v. Kimberly-Clark Corp., 511 F.2d 1352, 1361 (6th Cir.), cert. denied, 423 U.S. 994, 96 S.Ct. 420, 46 L.Ed.2d 368 (1975) ("EEOC [Title VII action] sues to vindicate the public interest, which is broader than the interests of the charging parties.... [T]he EEOC is not barred by the doctrine of res judicata from basing its complaint on the charges of discrimination which it never agreed to settle"). Cf. General Telephone Co. v. EEOC, 446 U.S. 318, 333, 100 S.Ct. 1698, 1707, 64 L.Ed.2d 319 (1980) (Addressing the issue of whether the EEOC could seek classwide relief without being certified as a class under Fed.R.Civ.P. 23, the Supreme Court held that the EEOC did not have to comply with Rule 23 since it sues to further the public interest and there are "differences between public and private interests involved"). Moreover, the government's special status in enforcing the public interest extends beyond those statutes that implicate underlying constitutional concerns as in the Voting Rights Act and Title VII. For example, the government enjoys this special status in antitrust cases in order that it might ensure proper freedom in the market. In Sam Fox Publishing Co. v. United States, 366 U.S. 683, 81 S.Ct. 1309, 6 L.Ed.2d 604 (1961) the Court noted that under the Sherman Act:
 
 
 26
 " 'private and public actions were designed to be cumulative, not mutually exclusive'.... '[T]he scheme of the statute is sharply to distinguish between government suits ... and private suits.... Different policy considerations govern each of these.... [Thus] it is clear that just as the Government is not bound by private antitrust litigation to which it is a stranger, so private parties similarly situated, are not bound by government litigation."
 
 
 27
 Id. 366 U.S. at 689-90, 81 S.Ct. at 1312-13. Similarly, the government's interest in bringing an ERISA action is to enforce fiduciary standards and ensure the financial stability of billions of dollars of assets which in turn have a monumental effect on not only the Treasury of the United States, but on the national economy and commerce as well. Thus, aside from its duty of protecting the individual beneficiaries of these pension programs, the government in this case clearly has an even stronger and paramount obligation to protect the very integrity, heart and lifeline of the program itself. In an ERISA action the Government participates as a party in order that it might sustain the very public confidence so necessary to the vitality of the enormous private pension fund system that provides billions of dollars of capital for investments affecting interstate commerce, and that substantially influences the revenues of the United States; further, the Secretary sues to enforce the fiduciary obligations undertaken by trustees of these pension funds and to assure the very uniformity of enforcement of the law under the ERISA statutes. A private litigant certainly is in no position to assume, much less argue, that the Secretary's responsibility is limited to ensuring the uniform enforcement of the ERISA statutes since his only interest in bringing an action is to seek recovery of his own losses.
 
 
 28
 The rule that Government actions asking courts to enforce federal statutes that implicate both public and private interests are not precluded by separate, private litigation was applied to ERISA in the Fifth Circuit's decision in Donovan v. Cunningham, 716 F.2d 1455 (5th Cir.1983), cert. denied, 467 U.S. 1251, 104 S.Ct. 3633, 82 L.Ed.2d 839 (1984).[13]
 
 
 29
 " 'This principle is based primarily upon the recognition that the United States has an interest in enforcing federal law that is independent of any claims of private citizens.... Also, any contrary rule would impose an onerous and extensive burden upon the United States to monitor private litigation in order to ensure that possible mishandling of a claim by a private plaintiff could be corrected by intervention.'
 
 
 30
 * * *
 
 
 31
 * * *
 
 
 32
 "The cases that have developed this principle have often involved statutory schemes like ERISA that provide for private enforcement of individual rights as well as suits by the government to vindicate the public interest in compliance with the law. For example, in suits to enforce Section 5 of the Voting Rights Act, the Attorney General of the United States is not bound by the results of prior litigation of the same issues by private parties. Hathorn v. Lovorn, 457 U.S. 255, 268 n. 23, 102 S.Ct. 2421, 2430 n. 23, 72 L.Ed.2d 824 (1982); City of Richmond v. United States, 422 U.S. 358, 373 n. 6, 95 S.Ct. 2296, 2305 n. 6, 45 L.Ed.2d 245 (1975); East Baton Rouge Parish, supra. Similarly, the Equal Employment Opportunity Commission may bring discrimination charges against an employer even after its employees have settled their private claims. New Orleans Steamship Ass'n v. EEOC, 680 F.2d 23, 25 (5th Cir.1982); EEOC v. Kimberly-Clark Corp., 511 F.2d 1352, 1361 (6th Cir.), cert. denied, 423 U.S. 994, 96 S.Ct. 420, 46 L.Ed.2d 368 (1975)."
 
 
 33
 Cunningham, 716 F.2d at 1462 (emphasis added). Thus, Cunningham observed:
 
 
 34
 "As in those cases, [Title VII and Voting Rights Act] the Secretary in the present case seeks to vindicate a public interest that is broader than the interests in the Alabama lawsuit. Those plaintiffs were interested in recouping only their own economic losses; the Secretary seeks to determine the legality of the specific conduct and to prevent those who have engaged in illegal activity from causing loss to any future ERISA plan participant. * Thus, although the monetary settlement in the prior litigation may have achieved the goals of the private plaintiffs, it is clearly inadequate to vindicate the broader interest of the Government."
 
 
 35
 Id. (emphasis added).
 
 
 36
 As recognized in the Cunningham decision, the Secretary in an ERISA action has an interest entirely separate and distinct from that of a private litigant since he seeks "to determine the legality of the specific conduct and to prevent those who have engaged in illegal activity from causing loss to any future ERISA plan participant."[14] In this case, as in all ERISA actions, the Secretary brought the action in order to protect the beneficiaries' retirement incomes, to assure uniform enforcement of the ERISA fiduciary obligations and to maintain and reinforce public confidence in the integrity and the financial well-being of the private pension system that provides billions of dollars for capital investments in public as well as private enterprises. The Secretary of Labor's interest in an ERISA action is thus clearly separate and distinct from the private plaintiffs' interests and thus cannot be barred by the doctrine of res judicata.
 
 C. Intervention
 
 37
 The appellees argue that Cunningham does not control the outcome of this case because in Cunningham the Secretary did not intervene in the private class action, while the Secretary did intervene in the Sullivan and Dutchak actions pursuant to its automatic right of intervention under 29 U.S.C. Sec. 1132(h) to object to the terms of the settlement. The fact that the Secretary intervened in the Sullivan and Dutchak actions, however, does not, should not, and will not preclude him from litigating his separate claims since the Secretary was forced to intervene after he learned that the private litigants had entered into backroom negotiations, without the Secretary's knowledge or participation, culminating in a complete and binding settlement agreement conditioning the entire settlement of the case upon the dismissal of the Secretary's action, without the Secretary's knowledge, participation or consent. Thus, on October 16, 1981, the private named plaintiffs in Dutchak and Sullivan and the CSPF published a memorandum of understanding disclosing the terms of a potential settlement encompassing the entire action (the asset mismanagement and benefit claims). This memorandum provided for settlement of the contested eligibility rules, and conditioned their agreement on the settlement of the asset mismanagement claims against the former trustees and dismissal of the DOL's action in Donovan. As noted by the plaintiffs' attorney at the October 21, 1981 status hearing, as a condition of the negotiations, the plaintiffs were required by the CSPF not to communicate with the Department of Labor concerning the potential settlement.[15] Once the Secretary learned of the settlement terms he was alarmed and surprised that the parties would even attempt to condition the settlement of a private plaintiff's action on the basis of dismissal of this public interest action. Thus, the Secretary intervened only for the limited purpose of objecting to the terms of the settlement, including the highly questionable requirement that the DOL "not be advised" of the settlement negotiations, as the parties surely knew that he could not possibly agree to such a settlement due to his sworn public duty of enforcing the ERISA statutes for the nation's benefit. We fail to understand how the district court would allow and approve a settlement where the parties have excluded the Secretary of Labor, a crucial participant who protects the national interest in enforcement of the laws governing pension and benefit plans, from the negotiations leading to a settlement based upon the dismissal of the Secretary's ERISA action. Nevertheless, the record reveals that the Secretary intervened for the very limited purpose of participating in the settlement hearings to the extent only of litigating class certification issues and the proper notice to be given to the class, as well as requesting discovery of financial information from the former trustees. The Secretary, however, did not negotiate with the insurance companies or their insureds, the former trustees, concerning the amount of money to be recovered by the fund as the former trustees refused to negotiate with the Secretary at any time during the course of this litigation. Certainly, it is obvious that these defendants would have no interest in negotiating with the Secretary since the proposed settlement limited the trustees' liability and thus it was to their benefit to argue that the Secretary's action was barred under the doctrine of res judicata. As demonstrated by the facts in this case, the Secretary had no choice but to intervene in the private class action to protect the interest of the public in general (understandably so because the terms of the settlement anticipated the dismissal of the Secretary's action), and thus his limited participation must not preclude him from fulfilling his statutory duty and obligation in pursuing a separate enforcement action.[16]
 
 
 38
 Further, the general rule is that the original parties to a suit may not stipulate away the rights of the intervenor:
 
 
 39
 "... parties who choose to resolve litigation through settlement may not dispose of the claims of a third party, and a fortiori may not impose duties or obligations on a third party, without that party's agreement. A court's approval of a consent decree between some of the parties therefore cannot dispose of the valid claims of nonconsenting intervenors; if properly raised, these claims remain and may be litigated by the intervenor.... And, of course, a court may not enter a consent decree that imposes obligations on the party that did not consent to the decree."
 
 
 40
 Firefighters Local 93 v. City of Cleveland, --- U.S. ----, 106 S.Ct. 3063, 3079, 92 L.Ed.2d 405 (1986) (citations omitted). See also, United States v. Borden, 347 U.S. 514, 74 S.Ct. 703, 98 L.Ed. 903 (1954) (prior consent decree entered between the parties to a private antitrust suit does not preclude the government from obtaining injunctive relief against the parties in a subsequent action). Raylite Electric Corp. v. Noma Electric Corp., 170 F.2d 914, 915 (2d Cir.1948). "... a stipulation signed after an intervener has entered cannot affect his [the intervener] rights.... The right to intervene ... presupposes that the intervenor has a right to protect which is not subject to the disposition of the parties already in the case." For example, in Wheeler v. American Home Products, 563 F.2d 1233, 1237-38 (5th Cir.1977), the Fifth Circuit held that the district court erred in approving a settlement between the original plaintiffs and defendants and dismissed the entire action with prejudice without considering the rights of the intervenor. See also Harris v. Amoco Production Co., 768 F.2d 669 (5th Cir.1985) (The EEOC, which represents the public interest, should not be dismissed from a case in which it intervened after the private litigants settled their claims). The precise issue herein is whether the Government really has a separate and distinct right or interest from that of the private plaintiffs in enforcing the provisions of ERISA. As previously established, it is clear that the Secretary does have a unique, distinct, and separate public interest, duty and responsibility in bringing this ERISA action to enforce the trustees' fiduciary obligations and duties, to ensure public confidence in the private pension system that provides billions of dollars of capital for investments affecting federal tax revenues and interstate commerce, and most importantly, to protect the income of the retired workers and beneficiaries. Further, the Secretary of Labor has a separate interest when he intervenes so as to prevent the establishment of harmful legal precedent as well as to ensure uniformity in the enforcement and application of ERISA laws. Moreover, in his amended complaint the Secretary petitioned for injunctive relief, separate from his requested relief for recovery of monies lost through the trustees' mismanagement of the Fund's assets. Although the district court did state that the Secretary could prove the substantial liability of the Trustees for the making of imprudent loans, the settlement failed to provide the necessary injunctive relief, requested by the Secretary, in order that he might prevent former trustees from holding similar positions of trusts in the future.[17] The appellees argue that the failure to provide for injunctive relief is inconsequential since the former trustees have not served on the board of CSPF for seven years and most are not now serving on any other pension trust board. Thus, the appellees argue that any potential threat is at best minimal since the trustees were no longer in any supervisory position. But the fact that these Trustees are not now serving does not prevent them from serving in the future, which the Secretary contends would be contrary to the best interests of the funds. The Secretary protects the public interest in "prevent[ing] those who have engaged in illegal activity from causing loss to any future ERISA plan participants." Cunningham, 716 F.2d at 1462. We venture to state that private parties can never be representatives of this clear, specific, and unambiguous national interest of the Secretary. Id. at 1462-63. Thus, the Secretary has a separate and distinct interest in seeking injunctive relief and his intervention does not preclude him from seeking to protect this separate interest apart from the interests the plaintiffs seek to protect themselves.[18]
 
 III. CLASS CERTIFICATION
 
 41
 The district court certified "all persons on whose behalf a contribution has been made or was required to be made to the Central States Southeast and Southwest Areas Pension Fund," as a class for purposes of this action. This class included the entire membership of the Teamsters Union, consisting of approximately 20,000 benefit claimants and over 400,000 asset mismanagement claimants. Although the certification of a class is within the sound discretion of the trial court and is reversible only if the court abuses its discretion, see, e.g., Liberles v. County of Cook, 709 F.2d 1122, 1126 (7th Cir.1983), Simer v. Rios, 661 F.2d 655, 668 (7th Cir.1981), cert. denied, 456 U.S. 917, 102 S.Ct. 1773, 72 L.Ed.2d 177 (1982), we are concerned that because of the conflict of interest between the benefit group and the asset mismanagement group, the named plaintiffs would not properly represent the putative class.
 
 
 42
 Fed.R.Civ.P. 23(a) sets forth the requirements for certification of a class action and provides, in part, that:
 
 
 43
 "One or more members of a class may sue or be sued as representatives on behalf of all only if ... (4) the representative parties would fairly and adequately protect the interests of the class."
 
 
 44
 (Emphasis added). Whether the named plaintiffs properly represent the class' interest depends upon a number of factors including: the adequacy of the named plaintiff's counsel, and the adequacy of representation provided in protecting the different, separate, and distinct interest of the absentee members. See, e.g., Horton v. Goose Creek, Ind. School Dist., 690 F.2d 470, 484 (5th Cir.1982), cert. denied, 463 U.S. 1207, 103 S.Ct. 3536, 77 L.Ed.2d 1387 (1983); Susman v. Lincoln American Corp., 561 F.2d 86, 90 (7th Cir.1977). In this case the Secretary of Labor does not challenge the adequacy of plaintiffs' counsel. As to the second factor, the law is clear that a single class cannot be fairly and adequately represented by the entirely different and separate named plaintiffs if the members of that class have antagonistic or conflicting interests. Hansberry v. Lee, 311 U.S. 32, 44-45, 61 S.Ct. 115, 119, 85 L.Ed. 22 (1940); Swain v. Brinegar, 517 F.2d 766, 779-80 (7th Cir.1975); Phillips v. Klassen, 502 F.2d 362, 366-67 (D.C.Cir.), cert. denied, 419 U.S. 996, 95 S.Ct. 309, 42 L.Ed.2d 269 (1974); 7 C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure Sec. 1768 at 638-39 (1972).
 
 
 45
 In the case before the court, there is a clear conflict of interest between the benefit group and the asset mismanagement group. The asset mismanagement group's interests[19] are adverse to the benefit group's interests[20] since the settlement provides for liberalization of the pension benefit rules that would result in a greater number of members becoming eligible for pension benefits. Thus, for every dollar that is expended or paid out from the Teamster's pension fund on benefits for the eligible members of the benefit group, there will be one less dollar available to provide benefits for the asset mismanagement group, which is an obvious conflict of interest. In fact, $140 million of the CSPF's assets were set aside under the terms of the settlement to cover claims made by members who are now eligible for pension under the new rules.
 
 
 46
 As to the conflict between those members of the class who favor liberalization of the pension benefit rules (the benefit claimants) and those members who may be opposed to any liberalization of the rules (the asset mismanagement claimants), the district court found that the named plaintiffs and the CSPF negotiated at arms length and that they vigorously contested each other's position such that: "The present trustees of the Fund [the defendant CSPF] have vigorously represented the interests of those class members who desire that there be but limited expansion of benefit eligibility." Courts have held, on rare occasions, that the unnamed class plaintiffs, whose interests were antagonistic to other members of the class, were adequately represented by defendants in a class action. See Horton, 690 F.2d at 487 (noting, however, that "[i]n many cases, we would hesitate to rely on the opponent of the class to represent the views of dissenting class members"); Dierks v. Thompson, 414 F.2d 453, 457 (1st Cir.1969). However, the record clearly evidences that in Dierks and Horton the courts were convinced that the defendants vigorously represented the interests of any possible dissenting class members and thus they held that the defendants had adequately represented the views of the dissenting class members. A critical distinction between the Dierks and Horton cases and this case is that the plaintiffs and defendants in this case agreed to settle the litigation while in Dierks and Horton there was no settlement. Since there was no settlement between the plaintiffs and defendants in the Dierks and Horton cases, the courts were assured that those unnamed class plaintiffs, whose interests conflicted with the rest of the class, would be adequately represented throughout the entire adversary process. We question whether, on the basis of the record before us, the defendants adequately represented the unnamed class plaintiffs. The unnamed plaintiffs and the CSPF settled this action, and the district court approved the settlement, despite the fact that the defendant-CSPF is not the typical defendant that would in this case necessarily represent the asset mismanagement group in resisting the liberalization of the pension benefit eligibility rules. The CSPF is represented by trustees (a new board that has replaced the defendant former trustees) who owe a fiduciary duty to represent the interests of the fund. In this case, the trustees had to assess whether the fund rules were in fact unduly restrictive and arbitrary in determining whether the CSPF had in the past denied pension benefits to deserving members of the union. The trustees certainly do not dispute the fact that more members of the union should qualify for pensions since they agreed to settle the action allowing for liberalization of the pension benefit rules. In contrast, the interests of the asset mismanagement group could not be more antithetical for that group has absolutely no interest in adding new participants to the pension plan since any payment to these new participants would decrease the amount of pension assets available for future pension disbursements. Therefore, we question the soundness of the district court's reasoning that the interests of the asset mismanagement group may be adequately represented by the defendant-CSPF.
 
 
 47
 Further, the trial court stated, as if it were not entirely convinced that the named plaintiffs[21] sought the greatest possible recovery under the circumstances for the asset mismanagement claims, that "[t]he Department of Labor in this case has vigorously represented the interests of those class members interested in a larger asset management recovery." It is difficult to understand how the Secretary could be an effective advocate, in the contexts of the Dutchak and Sullivan settlement, for a larger asset mismanagement recovery considering that the Secretary took no part in the negotiations concerning the asset mismanagement recovery. As stated in the district court's decision, there were no negotiations "between the DOL and the insurance companies...." District Court Opinion, August 27, 1984, slip op. at 7-8. Further, as noted throughout this opinion, the Secretary has a broad public role in enforcing the ERISA statutes that transcends the interests of any one group of participants or beneficiaries.
 
 IV. CONCLUSION
 
 48
 As the facts and circumstances in this case demonstrate, the Secretary of Labor of the United States is clearly entrusted with the duty, obligation and responsibility of representing the public interest in the enforcement of the ERISA statutes and thus is not in privity with the private litigants for purposes of the application of the doctrine of res judicata. The dire consequences the appellees forecast concerning the cost of litigating this case if it is remanded back to the district court are, at best, a red herring and greatly overstated.[22] The plaintiffs (excluding the Secretary of Labor) and defendants structured the settlement to include both the benefit and asset mismanagement claims; however, on remand no obstacle exists to prevent the parties from settling only the benefit claims apart from the asset mismanagement claims of the private litigants as the Secretary's interest in pursuing and resolving the asset mismanagement claims in hopes that he might facilitate and aid the recovery of losses with the collecting of damages from the personal assets of the former trustees. But we also note that our decision is not a determination that the Secretary is entitled to any specific type of relief on this particular claim. Rather, we remand this case to the district court to determine, with reasonable haste, whether the Secretary can establish his claim that the funds available to satisfy the asset mismanagement claim, including the personal assets of the former trustees, exceed the amount provided in the settlement.[23] If the Secretary is unable within a reasonable amount of time to present convincing evidence concerning his claim that the settlement is inadequate in that sufficient funds are available, the district court after proper and reasonable discovery should approve the settlement previously presented and dismiss the Secretary's claim for failure to state a claim or to establish the existence of a genuine issue of material fact, but not on grounds of res judicata. Accordingly, we reverse the district court's approval of the settlement agreement and remand for further consideration consistent with our holding herein.
 
 
 49
 CUDAHY, Circuit Judge, with whom, RIPPLE, Circuit Judge, joins, concurring.
 
 
 50
 I agree with the majority that the Secretary's claims are not now barred by the court-approved settlement agreement. But it is far from clear that the Secretary's arguments with respect either to class certification or to a proper settlement are meritorious. Hence, as the majority provides, he should have a limited time to establish his points or have his claims denied.
 
 
 51
 BAUER, Chief Judge, dissenting.
 
 
 52
 I am unable to agree with the court's interpretation of the legislative history underlying the Employee Retirement Income Security Act (ERISA), 29 U.S.C. Ch. 18, or the expansive role which the court assigns the Department of Labor (DOL) under that statutory scheme. In this case, whether the Secretary of Labor's (Secretary) claim in Donovan is barred by the doctrine of res judicata turns upon the statutory role of the DOL in bringing an ERISA action. It is the scope of this statutory function which defines the legal interest of the DOL and thus, determines whether res judicata applies where a private claimant has proceeded to a court-approved settlement of the identical claim involving the same parties as that now brought by the Secretary of Labor.
 
 I. RES JUDICATA
 
 53
 Under res judicata, "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." Allen v. McCurry, 449 U.S. 90, 94, 101 S.Ct. 411, 414, 66 L.Ed.2d 308 (1980); Beard v. O'Neal, 728 F.2d 894, 896 (7th Cir.1984). Strict identity of the parties is not necessary to achieve privity. Privity applies to successive parties who adequately represent the same legal interests. Southwest Airlines Co. v. Texas Internat'l Airlines, Inc., 546 F.2d 84, 95 (5th Cir.), cert. denied, 434 U.S. 832, 98 S.Ct. 117, 54 L.Ed.2d 93 (1977); Jefferson School of Social Science v. Subversive Activities Control Bd., 331 F.2d 76, 83 (D.C.Cir.1963); see generally TRW, Inc. v. Ellipse Corp., 495 F.2d 314, 317-18 (7th Cir.1974). The conclusion compelled by a fair reading of the ERISA legislation is that the Secretary does represent the same legal interests that are involved in Dutchak and Sullivan and therefore, is barred from bringing this action under the doctrine of res judicata.
 
 
 54
 Congress enacted ERISA in 1974 to promote the well-being and security of employees and their dependents by protecting their interests in employee benefit plans. 29 U.S.C. Sec. 1001(a); Leigh v. Engle, 727 F.2d 113, 139 (7th Cir.1984). This congressional purpose is effectuated "by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the federal courts," 29 U.S.C. Sec. 1001(b). To this end, Congress required that "all assets of an employee benefit plan be held in trust by one or more trustees." 29 U.S.C. Sec. 1103(a). Every such trustee is a "fiduciary," 29 U.S.C. Sec. 1002(21)(A), subject to comprehensive standards of conduct. 29 U.S.C. Secs. 1104-1113. ERISA prescribes, for example, that every plan fiduciary shall discharge his duties with respect to a plan "solely in the interest of the participants and beneficiaries" and with the "care, skill, prudence and diligence" that a reasonable person "familiar with such matters" would employ if acting under similar circumstances. 29 U.S.C. Sec. 1104(1)(1).
 
 
 55
 ERISA expressly authorizes participants, beneficiaries, and the Secretary of Labor to enforce the Act's fiduciary standards. 29 U.S.C. Sec. 1132(a)(2), (3) and (5). Specifically, participants, beneficiaries, and the Secretary may bring suit in federal court and hold fiduciaries "personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary...." 29 U.S.C. Secs. 1109(a), 1132(a)(2). A breaching fiduciary is also subject to other appropriate "equitable or remedial relief," including removal from his or her position as a fiduciary. Id.
 
 
 56
 The enforcement provisions of ERISA are intended to provide the Secretary, as well as participants and beneficiaries, with broad, flexible remedies to redress or prevent statutory violations. See, e.g., S. Rep. No. 383, 93d Cong., 1st Sess. 8, 105 (1973), reprinted in LEGISLATIVE HISTORY OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, 94th Cong., 2d Sess. 1076, 1173 (1976) (hereinafter cited as LEGISLATIVE HISTORY); H. Rep. No. 533, 93d Cong., 1st Sess. 17, 26 (1973), reprinted in LEGISLATIVE HISTORY at 2364, 2373; Leigh v. Engle, supra, 727 F.2d at 139; Donovan v. Mazzola, 716 F.2d 1226, 1235, 1239-40 n. 9 (9th Cir.1983), cert. denied, 464 U.S. 1040, 104 S.Ct. 704, 79 L.Ed.2d 169 (1984). The fiduciary standards "must be enforced with 'uncompromising rigidity.' " NLRB v. Amax Coal Co., 453 U.S. 322, 329-34, 101 S.Ct. 2789, 2794-96, 69 L.Ed.2d 672 (1981), quoting from Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545, 546 (1928); see also Eaves v. Penn, 587 F.2d 453, 462 (10th Cir.1978); Marshall v. Snyder, 572 F.2d 894, 901-02 (2d Cir.1978).
 
 
 57
 The majority argues that Congress intended the Secretary of Labor to bear the primary responsibility for enforcing ERISA, both to protect the rights of plan participants and beneficiaries and to further the broader public policy goals set forth in the statute. The majority opinion contends that this preeminent role is evident from an examination of ERISA and its predecessor legislation, the Welfare and Pension Plan Disclosure Act, Pub. L. 85-836, 72 Stat. 997 (repealed 1976).
 
 
 58
 Contrary to the court's assertions, however, the legislative history of ERISA demonstrates that section 502(a)(2) of ERISA, 29 U.S.C. Sec. 1132(a)(2), was intended to grant both private parties and the Secretary equal standing to bring an action on behalf of fund beneficiaries. Repeatedly, Congress expressed its belief that the chief weakness of the Welfare and Pension Plans Disclosure Act, the predecessor act governing pension funds, was its sole reliance upon "the initiative of the individual employee to police the management of his plan." S. Rep. No. 127, 93d Cong., 1st Sess. 4 (1973), reprinted in LEGISLATIVE HISTORY at 613; H. Rep. No. 533, 93d Cong., 1st Sess. 4 (1973), reprinted in LEGISLATIVE HISTORY at 2351; 120 Cong. Rec. 3978 (1974) ("Employee Benefit Security Act of 1974: Material Explaining H.R. 12906 Together With Supplemental Views," introduced by Representative Perkins), reprinted in LEGISLATIVE HISTORY at 3295; 120 Cong. Rec. 4281 (1974) (remarks of Representative Gaydos), reprinted in LEGISLATIVE HISTORY at 3377; 119 Cong. Rec. 147 (1973) (remarks of Senator Ribicoff), reprinted in LEGISLATIVE HISTORY at 207; 120 Cong. Rec. 19957 (1974) (remarks of Senator Ribicoff), reprinted in LEGISLATIVE HISTORY at 4811. It was this concern which led Congress to grant the Secretary enforcement powers under section 502(a)(2) of ERISA co-extensive with those accorded private litigants. The "Civil Enforcement" provision of ERISA provides that "[a] civil action may be brought (1) ... by a participant or beneficiary ... [or] (2) by the Secretary...." 29 U.S.C. Sec. 1132. There is nothing in the statutory language which grants any more preeminent right of action to the Secretary than to private litigants.
 
 
 59
 The legislative hearings, reports, and debates variously refer to the Secretary's role as one of "watchdog," "guardian," or "protect[or]" of the private beneficiaries. S.Rep. No. 634, 92d Cong., 2d Sess. 109 (1972); Welfare and Pension Plan Legislation: Hearings on H.R. 2 and H.R. 462 Before the General Subcommittee on Labor of the House Committee on Education and Labor, 93d Cong., 1st Sess. 373 (1973) (statement of Bernard E. Nash, National Retired Teachers Association an American Association of Retired Persons); 119 Cong.Rec. 30011 (1973) (remarks of Senator Beall), reprinted in LEGISLATIVE HISTORY at 1620. But the legislative record clearly reflects that Congress intended the Secretary to act as a representative of fund beneficiaries. Plan participants, beneficiaries, or the Secretary of Labor on behalf of the participants and beneficiaries are allowed to bring civil actions to redress breaches of a fiduciary's responsibility or to remove a fiduciary who has failed to carry out his duties. H.R.Rep. No. 533, 93d Cong., 1st Sess. 20 (1973), reprinted in LEGISLATIVE HISTORY at 2367; 120 Cong. Rec. 3979 (1974) ("Employee Benefit Security Act of 1974: Material Explaining H.R. 12906 Together with Supplemental Views," introduced by Representative Perkins), reprinted in LEGISLATIVE HISTORY at 3299.
 
 
 60
 Thus, in granting the Secretary enforcement powers in Section 1132 I believe Congress intended that the Secretary's interest be the same as that of the participants and beneficiaries who also had enforcements powers under Section 1132. The Secretary's only public interest enforceable under Section 1132 is that the rights of the participants and beneficiaries of a given plan are protected.
 
 
 61
 Recent statements by the Supreme Court in Massachusetts Mutual Life Insurance Co. v. Russell, 473 U.S. 134, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985), apply with particular force here. In Massachusetts Mutual the Court was asked to interpret the civil enforcement provisions of 29 U.S.C. Sec. 1132. In holding that Congress did not intend to authorize remedies not expressly incorporated in ERISA, the Court stated:
 
 
 62
 Inclusion of the Secretary of Labor is indicative of Congress's intent that actions for breach of fiduciary duty be brought in a representative capacity on behalf of the plan as a whole. Indeed, the common interest shared by all four classes is in the financial integrity of the plan.
 
 
 63
 105 S.Ct. at 3090-91 n. 9.
 
 
 64
 While Congress provided the Secretary with far-reaching authority to monitor plan activities, this authority is not an indicium of Congress's intent that the Secretary's enforcement authority under Section 1132 be broader than the participants' and beneficiaries' authority. One cannot read these powers in isolation from the rest of ERISA, but must construe them in the context of the entire statute. Richards v. United States, 369 U.S. 1, 11, 82 S.Ct. 585, 592, 7 L.Ed.2d 492 (1962).
 
 
 65
 The Act requires extensive disclosure to the Secretary by plan administrators of financial data and other information relating to a plan. 29 U.S.C. Sec. 1021(b), 1024(a). ERISA also provides the Secretary with broad investigatory powers to monitor plans, including the authority to conduct "spot" audits on the premises of the plan and to subpoena witnesses, id. Sec. 1134, and provides for cooperation between the Secretary and other government agencies in carrying out the Secretary's responsibilities. Id. Sec. 1136. Rather than indicating an intent that the Secretary act independent of the interests of plan participants and beneficiaries, these provisions are fully consistent with the Congressional intent that the Secretary act on behalf of the participants and beneficiaries. These investigatory powers are necessary so that the Secretary is fully informed about the plan and can monitor its implementation consistent with the interests of the participants and beneficiaries--and nothing more.
 
 
 66
 Additionally, the majority relies on Donovan v. Cunningham, 716 F.2d 1455 (5th Cir.1983), cert. denied, 467 U.S. 1251, 104 S.Ct. 3533, 82 L.Ed.2d 839 (1984), to support its argument that when bringing suits under Section 1132, the Secretary is suing to safeguard "the broader public interest" as well as to seek relief for plan participants and beneficiaries. Cunningham involved an ERISA suit by the Secretary, followed ten months later by a private class upon the same grounds in a different jurisdiction. The Secretary lost at the trial level and, while that case was on appeal, the private action was settled. The Secretary was not a party to the private action and in no way participated in the settlement.
 
 
 67
 The majority's reliance on Cunningham is misplaced. In determining that the doctrine of res judicata or collateral estoppel did not bar the Secretary's appeal, the Cunningham court relied upon "the general principle of law that the United States will not be barred from independent litigation by the failure of a private plaintiff." 716 F.2d at 1462 (citing United States v. East Baton Rouge Parish School Board, 594 F.2d 56, 58 (5th Cir.1979)). The Fifth Circuit specifically noted, however, that it was "not consider[ing]" whether "a prior private settlement may limit the scope of the relief that the government may seek on behalf of settling parties," id. at 1462 n. 10, and remanded the case for the express purpose of determining whether the private action had such a preclusive effect.
 
 
 68
 The Fifth Circuit also noted two aspects of the Cunningham case which are clearly distinguishable from this case. First, the court in Cunningham noted that the private plaintiffs' interests were only in recouping their own economic losses, whereas the Secretary sought in Cunningham to determine the legality of specific conduct and to guard against future losses to the plan. This is clearly distinguishable from the CSPF settlement in this case wherein the legality of the trustees' conduct, recoupment of past losses, and the future integrity of the plan were clearly at issue and negotiated extensively in the course of the settlement. Second, the Fifth Circuit noted that "[a]lthough the record ... indicates that the Secretary consulted and cooperated with counsel for the [private] plaintiffs to a limited extent, the government did not have a 'sufficient "laboring oar" in the conduct of the [private] litigation to actuate the principles of estoppel.' " 716 F.2d at 1463 n. 11. In this case, quite the contrary occurred. The Secretary's action was tried before the same court, the Secretary intervened in the private actions, the cases were consolidated for discovery purposes, and the Secretary played a major role in the discovery and in the negotiation of the settlement. Notwithstanding the majority's assertions regarding the compulsory and restricted participation of the Secretary, this case is unlike Cunningham because here the Secretary utilized his statutory right of intervention and became a full participant in a settlement process spanning several years. After taking such an active role in the settlement process, the Secretary cannot declare himself beyond the power of the district court once the court, contrary to his wishes, concluded that the settlement was fair and reasonable.
 
 
 69
 ERISA was enacted in reaction to the inability of participants and beneficiaries to adequately police the management of pension plans. Simply because the Secretary of Labor is now included as an additional enforcement agent, it does not follow that Congress intended the Secretary's role to be preeminent to that which plan participants and beneficiaries had under previous statutes or are to have under ERISA. Indeed, their interests are precisely the same.
 
 II. CLASS CERTIFICATION
 
 70
 Additionally, I cannot support the majority's conclusions regarding certification of the plaintiff class. The majority opinion concludes that the district court improperly certified as one class two groups of plaintiffs with antagonistic interests. Rule 23(a) of the Federal Rules of Civil Procedure sets forth four factors which must be met before a district court can certify a cause of action as a class action. The rule provides:
 
 
 71
 (a) PREREQUISITES TO CLASS ACTION. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.
 
 
 72
 The majority challenges the class certification only with regard to the fourth requirement, arguing that the private plaintiffs are inadequate because they seek to represent a class within which there are substantial conflicting economic interests. This conflict arises according to the majority, because to the extent that both benefit claims and asset mismanagement claims were successful, the asset mismanagement group would be deprived of the full enjoyment of its recovery.
 
 
 73
 The district court certified the class in this case as "consisting of all persons on whose behalf a contribution has been made or was required to be made to the Central States Southeast and Southwest Areas Pension Fund." The court recited the following facts in its order to support its conclusion that this was a proper class under Rule 23.
 
 
 74
 a. The class is in excess of 400,000 and is so numerous that joinder of all members is impracticable.
 
 
 75
 b. The complaint alleges common questions of law and fact. These include:
 
 
 76
 1. Whether the benefit rules of the CSPF are arbitrary and capricious.2. Whether fiduciaries of the CSPF breached their fiduciary duties in connection with asset management transactions of the Fund.
 
 
 77
 3. Whether the CSPF, the [Teamsters], other [Teamster]-related entities and the individual defendants conspired to disseminate false information about Fund benefit rules to limit Fund benefits, and to use Fund assets for purposes other than the best interests of the participants.
 
 
 78
 c. The claims of the numerous representative plaintiffs enumerated in the Sullivan and Dutchak complaints are typical of the benefit complaints of the Class: that participants with many years of service and substantial contributions on their behalf to the Fund have been denied benefits through the arbitrary and capricious provisions of Fund benefit rules.
 
 
 79
 d. All participants benefit from the recovery by the CSPF of losses caused by breaches of fiduciary.
 
 
 80
 e. The representative parties are able to adequately represent the interests of the class. Their counsel, Lawrence Walner and Edmund W. Kitch, have extensive experience; they have demonstrated to the court through their negotiation of the settlement, briefing of these matters and appearances and various filings before the court, that they are able to effectively advance the interests of the class. They have done so in this litigation.
 
 
 81
 f. The settlement agreement was negotiated between counsel for the plaintiff class and the trustees of the Fund in a manner that was not collusive and which fairly and adequately represented the interests of all members of the class. No potential conflict of interest was such that counsel of any representative party was rendered unable to adequately represent the settlement class. Prior to the successful outcome of the settlement negotiations each party vigorously contested the positions of the others and nothing was done without massive fights, lots of briefs, vigorous arguments, and several different positions.
 
 
 82
 g. The Department of Labor in this case has vigorously represented the interests of those class members interested in a larger asset management recovery.
 
 
 83
 h. The present trustees of the Fund have vigorously represented the interests of those class members who desire that there be but limited expansion of benefit eligibility.
 
 
 84
 i. The investigation and discovery of the matters underlying this litigation have been under way for more than seven years. The investigation by the Department of Labor of the CSPF is believed to be its most extensive ERISA investigation. Prior to the filing of Donovan the Department of Labor conducted an extensive administrative investigation. The Donovan complaint was on file for three and one-half years before this court granted a stay of discovery in light of the then prospects for a settlement agreement. Counsel for the participants have extensively investigated matters relating to the CSPF. All parties have had sufficient information to evaluate the settlement and have provided the court with sufficient information to evaluate the reasonableness of the settlement.
 
 
 85
 j. The settlement class is reasonable.
 
 
 86
 The certification of a class is within the sound discretion of the trial court, reversible on appeal only for an "abuse of discretion." Liberles v. County of Cook, 709 F.2d 1122, 1126 (7th Cir.1983); Simer v. Rios, 661 F.2d 655, 668 (7th Cir.1981), cert. denied, 456 U.S. 917, 102 S.Ct. 1773, 72 L.Ed.2d 177 (1982). The majority concludes that the district court abused its discretion in this case because the existence of the asset mismanagement claims and the benefit claims rendered the plaintiff class an inadequate representative under Rule 23(a)(4). "Whether a party would adequately protect the interests of the class is a question of fact depending on the circumstances of each case." Susman v. Lincoln American Corp., 561 F.2d 86, 90 (7th Cir.1977) (citing Schy v. Susquehanna Corp., 419 F.2d 1112, 1116 (7th Cir.), cert. denied, 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970)). This adequacy determination is itself a matter of discretion and will not be disturbed unless an abuse of discretion is shown. Susman, 561 F.2d at 90. I disagree with the majority's determination that the district court abused its discretion in finding that the plaintiffs in this case adequately represent the class as certified.
 
 
 87
 Under Rule 23, class plaintiffs cannot fairly and adequately protect the interests of the class they seek to represent if they present a claim about which members of the class have antagonistic or conflicting interest. Hansberry v. Lee, 311 U.S. 32, 44-45, 61 S.Ct. 115, 119, 85 L.Ed. 22 (1940); Swain v. Brinegar, 517 F.2d 766, 780 (7th Cir.1975). While a conflict of interest is theoretically possible in this case because of the existence of two potentially conflicting claims no such conflict affected this settlement. See In re Trans-ocean Tender Offer Securities Litigation, 455 F.Supp. 999, 1014 (N.D.Ill.1978). The multiplicity of parties already before the court assured that diverse positions would be argued vigorously to the court. The representative plaintiffs include a participant already receiving a maximum pension, who approves of the settlement. The benefits and asset mismanagement aspects of the settlement were thoroughly discussed during the negotiations. The ultimate settlement was a compromise of these different positions, drawing for much of its structure upon compromises embodied in ERISA itself. The district court thus was provided with a range of views on the merits of the positions of each of the parties, and on the merits of the settlement from diverse perspectives. The district court was keenly aware of the potential for conflict in this case and guarded against that potential affecting the fairness of the settlement.
 
 
 88
 Moreover, the joinder of the benefit and asset mismanagement claims was justified by the interrelationship between the two. Investment recovery could improve the financial position of the CSPF and reduce the need for benefit denials based upon limited funds. Proof of a systematic practice of investment negligence would provide corroborative circumstantial evidence that the trustees attended to issues of benefit entitlement in a similarly inattentive fashion. Only the CSPF could agree to remedy the benefit claims. Only the individual defendants and the insurance carriers could agree to settle the investment claims. Each negotiation proceeded separately, at separate times, with full information to the court. The district court had ample reason to conclude that "on a settlement, the question is not whether the class will be represented adequately but whether it, in fact has been adequately represented. Most assuredly here, those interests have been adequately represented." The two aspects of the complaint were closely related, but they were complementary, not in conflict. I would therefore, affirm the judgment of the district court.
 
 
 
 *
 The original opinion in this case was issued and affirmed the order of the district court on November 15, 1985, with Circuit Judge John L. Coffey dissenting. The Secretary of Labor petitioned for a rehearing en banc and the original opinion of the panel was vacated and this opinion substituted by the court sitting en banc
 
 
 [1]
 Title 29 U.S.C. Sec. 1104, provides, in pertinent part:
 "(a)(1) Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and--
 (A) for the exclusive purpose of:
 (i) providing benefits to participants and their beneficiaries; and
 (ii) defraying reasonable expenses of administering the plan;
 (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;
 (C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and
 (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter or subchapter III of this chapter.
 * * *
 
 
 [2]
 In 1981, the DOL amended its complaint to include the CSPF as a party defendant. The DOL and the CSPF entered into a consent decree in 1982 providing for a special counsel to overlook the management of the CSPF in the future
 
 
 [3]
 The CSPF had the necessary leverage to make this demand during the negotiations since CSPF was the party participating in the settlement negotiations that were responsible for the liberalization of the pension benefit rules
 Also, during this period of negotiations, the private plaintiffs apparently engaged in preliminary discussions with the insurance companies, dealing with payments to be made to the fund to settle the asset mismanagement claims of the private plaintiffs against the former trustees.
 
 
 [4]
 Section 1132(h) provides:
 "A copy of the complaint in any action under this title by a participant, beneficiary, or fiduciary ... shall be served upon the Secretary and the Secretary of the Treasury by certified mail. Either Secretary shall have the right in his discretion to intervene in any action, ..."
 
 
 [5]
 The total liability coverage of the two policies was approximately $7 million; however, questions were raised during the course of this litigation as to the scope of the protection under these policies
 
 
 [6]
 The appellees convinced the district court that the gross assets of all the trustees, except for Barron and Presser, did not exceed $5 million and that after the prior liens on their property and the cost of this litigation were considered, the potential recoverable amount would be well below $2 million. The court also found that the asserted defenses of the insurance companies created a substantial risk that recovery would not be available if the case went to trial. The appellees cite no support in the record for this assertion nor have we been able to identify any support herein in our review of the record
 
 
 [7]
 The court also found that four of the former trustees were now convicts and thus not eligible to serve under ERISA and that three other trustees were deceased
 
 
 [8]
 The district court found that privity was established in this case because (1) there is a "congruence of legal interests" between the Secretary and the private plaintiffs, (2) the private plaintiffs have adequately represented the Secretary's interests, and (3) the relationship between the private plaintiffs and the Secretary is "sufficiently close" due to the identity of their interests under ERISA
 
 
 [9]
 Privity has been appropriately described as an "elusive concept," see Nash Cty. Bd. of Ed. v. Baltimore Co., 640 F.2d 484, 493 (4th Cir.1981), but as described there:
 "[Privity] designates ... a person so identified in interest with a party to former litigation that he represents precisely the same legal right in respect to the subject matter involved.... Or ... the term is sufficiently inclusive 'under the federal law of res judicata [that] a person may be bound by a judgment even though not a party if one of the parties to the suit is so closely aligned with his interests as to be his virtual representative.' "
 Id. at 493-94 (citations omitted).
 
 
 [10]
 District Court Order, dated November 17, 1981
 
 
 [11]
 The dissent, in equating the interests of the beneficiaries with those of the Secretary isolates and interprets the enforcement provisions of ERISA as though those provisions were unrelated to the explicit provisions of ERISA reflecting the overriding national concern that Congress expressed in enacting ERISA in 1974. As Congress stated in its findings and declaration of policy:
 "The Congress finds ... that the operational scope and economic impact of such plans is increasingly interstate; that the continued well-being and security of millions of employees and their dependents are directly affected by these plans; that they are affected with a national public interest; that they have become an important factor affecting the stability of employment and the successful development of industrial relations...."
 ERISA Sec. 1001(a).
 
 
 [12]
 The Supreme Court's decision in Massachusetts Life Ins. Co. v. Russell, --- U.S. ----, 105 S.Ct. 3085, 3090-91 n. 9, 87 L.Ed.2d 96 (1985), does not support a result contrary to that which we reach here. The issue in Russell was whether "a fiduciary to an employee benefit plan may be held personally liable to a plan participant or beneficiary for extra-contractual compensatory or punitive damages caused by improper or untimely processing of benefit claims." Id. 105 S.Ct. at 3087. The plaintiff argued that Sec. 502(a)(2) [29 U.S.C. Sec. 1132(a)(2) ] authorizing a beneficiary to bring an action against a fiduciary who has violated Sec. 409 [29 U.S.C. Sec. 1109] allowed her personal recovery; the defendant argued that recovery for a violation of Sec. 409 [Sec. 1109] inures to the benefit of the plan as a whole. Id. 105 S.Ct. at 3089. The Supreme Court agreed: "A fair contextual reading of the statute makes it abundantly clear that its draftsmen were primarily concerned with the possible misuse of plan assets, and with remedies that would protect the entire plan, rather than with the rights of an individual beneficiary." Id. 105 S.Ct. at 3090. The Court mentioned in footnote 9 that, "[i]nclusion of the Secretary of Labor is indicative of Congress' intent that actions for breach of fiduciary duty be brought in a representative capacity on behalf of the plan as a whole. Indeed, the common interest shared by all four classes [of plaintiffs under 29 U.S.C. Sec. 1132(a)(2) ] is in the financial integrity of the plan." A review of Sec. 502 [29 U.S.C. Sec. 1132] reveals that this passing inference to a "representative capacity" and the "financial integrity of the plan" must not be read as broadly as the defendants would have us believe. While the Secretary may sue to protect the financial integrity of the pension plan, and thus act in a representative capacity, he also has other responsibilities, duties and interests in bringing his action. For example, only the Secretary may collect additional civil penalties pursuant to 29 U.S.C. Sec. 1132(a)(6); this is clearly an example of the Secretary acting in a role other than as a representative of a particular plan seeking to recover monetary claims for that plan
 
 
 [13]
 See also Picardi v. Chicago Truck Drivers, 581 F.Supp. 794, 797 (N.D.Ill.1983). In Picardi, the district court recognized that:
 "Privity for res judicata purposes expresses the idea that a person is so identified in interest with the party in a previous litigation that precisely the same legal right in respect to the subject matter is involved. In this case, the interests presented by the Secretary and by Piacardi are not precisely the same. The Secretary's action is brought to assure the union's compliance with the statutory law. He represents the 'public interest,' whereas, Mr. Piacardi brings his action to obtain relief from damage to his personal interest and that of the other members of his class ... it cannot logically be said that the plaintiff here is in privity with the Secretary of Labor."
 
 
 [14]
 In its attempt to distinguish Cunningham, the dissent selectively quotes from n. 10, at 762-63, and asserts that in Cunningham, the Fifth Circuit did not consider "whether 'a prior private settlement may limit the scope of the relief that the government may seek on behalf of settling parties.' " A close reading of Cunningham makes it clear that the appellate court did not decline to "consider" the question of whether a prior private settlement precluded the government from seeking relief on behalf of beneficiaries in the district court, but rather refused to consider only the question of whether remedies not available to plan beneficiaries are available to the government:
 "The Secretary responds that because the equitable remedies of disgorgement or constructive trust are intended to prevent unjust enrichment, ... they are available to the government, even if any payments to the ESOP participants would be barred.... Since all the substantive issues in this case are raised by the Secretary's claims for injunctive relief, and since our holding will necessitate a remand anyway, we think the best approach is for the district court to first consider the disgorgement claims when it determines the scope of relief on remand."
 716 F.2d at 1462-63 n. 10. Clearly this note does not address the separate issue of whether the Secretary has a separate and distinct interest from the beneficiaries in this litigation.
 
 
 [15]
 Contrary to the dissent's assertion that "the Secretary played a major role in the discovery and in the negotiation of the settlement," the parties expressly precluded the Secretary's participation in the negotiation process. As plaintiffs' counsel stated at the October 21, 1981 status hearing:
 "Now, as a condition of the negotiations, we [plaintiffs] were required to agree not to communicate with the Department of Labor about this activity [settlement] or the contents. We were informed that parallel negotiations were being conducted by the defendants with the Department of Labor."
 Thus the Secretary was hardly a "full participant in a settlement process spanning several years" as the dissent claims. As the following discussion makes clear, the Secretary was forced to intervene, but only in a very limited nature, and contrary to the assertion of the dissent, was not able to play a "major role" in the settlement process because he did not negotiate with the insurance companies or their insureds as the former trustees were unwilling to negotiate with the Secretary at any time during the course of this litigation.
 
 
 [16]
 Further, even if one were to assume that the interests of the Secretary and the class plaintiffs were the same, which clearly they are not since the Secretary's responsibility to enforce ERISA for the benefit of the nation in general was distinct from the individual interests or the class plaintiffs, under these circumstances where the Secretary did not participate in structuring the settlement agreement it is impossible to conclude that the private plaintiffs had adequately represented the Secretary's interests in enforcing the ERISA provisions so that the doctrine of res judicata would bar the Secretary's separate action. See Southwest Airlines Co., 546 F.2d at 102 (stating that "[e]ven though [plaintiffs] were not parties to that action ... their interests were sufficiently represented ..." by the parties in the previous action)
 
 
 [17]
 This concern obviously is not relevent with respect to the three deceased former Trustees and the four former trustees who have been convicted of crimes and thus are now ineligible to serve as Trustees
 
 
 [18]
 The district court also erred when it held that the Secretary was estopped to deny privity under the doctrine of preclusion against inconsistent positions. The district court's Findings of Fact and Conclusions of Law slip op. at 22 (August 27, 1984). Under this doctrine, a party may be precluded from advocating a position which is inconsistent with the position taken with respect to the same facts in prior litigation. See Himel v. Continental of Illinois v. Nat'l Bank & Trust Co., 596 F.2d 205, 210 (7th Cir.1979). Apparently, the district court felt that since the Secretary of Labor earlier argued that he "shared a community of interest" with the private plaintiffs for purposes of discovery of financial information from the CSPF, he could not now claim the privity did not exist. In an earlier order the district court noted and found that the interests of the Secretary may not be the same as those of the plan participants in every situation. See Donovan v. Fitzsimmons, 90 F.R.D. 583, 586-87 (N.D.Ill.1981). Further, the district court noted that the interest of the Secretary and the beneficiaries were similar with respect to their need for discovery of CSPF documents, but that these interests "might somewhat diverge" at a later time. Id. Thus it is clear that the district court recognized that within the context of this fact situation the Secretary's interest would not always be the same as those of the private litigants at any given point in the course of this litigation
 
 
 [19]
 Those union members who are interested only in recovery of funds lost through the negligence of the trustees
 
 
 [20]
 Those union members seeking to liberalize the pension benefit rules
 
 
 [21]
 Seven of the eight unnamed plaintiffs in the Sullivan action were benefit claimants only
 
 
 [22]
 See footnote 6, supra
 
 
 [23]
 In determining whether the Secretary's claim that the asset mismanagement portion of the settlement is inadequate, the district court should consider the Secretary's request for injunctive relief, and make the determinations only after having given the Secretary sufficient and adequate time to complete the discovery necessary in order that the court might properly assess the Secretary's claim to determine whether an excess of $2 million is available for recovery from the Trustees