NEW ORLEANS STEAMSHIP ASSOCIATION, Plaintiff-Appellee,

v.

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Defendant-Appellant.

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff-Appellant,

v.

NEW ORLEANS STEAMSHIP ASSOCIATION, Defendant-Appellee.

No. 81–3454
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

July 6, 1982.

Raymond R. Baca, Atty., EEOC, Appellate Div., Washington, D.C., for defendant-appellant.

Monroe & Lemann, Andrew P. Carter, David E. Walker, Alvin J. Bordelon, Jr., New Orleans, La., for plaintiff-appellee.

Before BROWN, POLITZ and WILLIAMS, Circuit Judges.

POLITZ, Circuit Judge:

The district director of the Equal Employment Opportunity Commission (EEOC) seeks enforcement of an administrative subpoena *duces tecum* served upon the New Orleans Steamship Association (NOSSA), pursuant to section 710 of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–9,[1] and 29 C.F.R. § 1601.16(a).[2] The subpoena was issued in the course of an EEOC investigation of charges that NOSSA had engaged in unlawful employment practices by its use of a pre-employment examination which effectively discriminated against black and female applicants for jobs as clerks and checkers on the New Orleans riverfront. Citing *Equal Employment Opportunity Comm'n v. University of New Mexico*, 504 F.2d 1296 (10th Cir. 1974), the district court found the subpoena irrelevant and refused enforcement. We reverse and remand.

NOSSA is composed of employers providing stevedoring, shipping, and various other services to the shipping industry in the Port of New Orleans. For many years, a labor agreement between NOSSA and the New Orleans Clerks' and Checkers' Union, Local 1497, International Longshoremen's Association, AFL–CIO, prescribed the manner of hiring and assigning clerks and checkers on the New Orleans waterfront. In 1971, a class action was filed against NOSSA and the union, alleging discrimination in employment of blacks, contrary to Title VII.[3] In 1973 a second class action was filed on substantially the same grounds.[4] The suits were consolidated and were ultimately resolved by entry of a consent decree on June 18, 1975. The consent decree defined the class as:

All black persons who, subsequent to May 26, 1969, made themselves available, or who could have made themselves available, for employment as "clerks" and/or "checkers" through New Orleans Steamship Association, its members, or through New Orleans Clerks and Checkers Union, Local No. 1497 of the International Longshoremen's Association, AFL–CIO at the Port of New Orleans and ... other terminals ....

The consent decree barred NOSSA from further use of tests administered prior to the decree to applicants seeking clerk and checker positions. New tests were to be prepared by a professional selected by the parties, but were not to be used until approved by the court. NOSSA was "permanently enjoined from engaging in any act or practice relating to any employment opportunity which has the purpose or effect of discriminating against any individual ... seeking employment on the basis of race

---

**1.** Section 710 states in relevant part: "For the purpose of all hearings and investigations conducted by the Commission ... section 161 of Title 29 shall apply." And 29 U.S.C. § 161 reads, in part: "The Board ... shall at all reasonable times have access to, for the purpose of examination, and the right to copy any evidence of any person being investigated or proceeded against that relates to any matter under investigation or in question."

**2.** Section 1601.16(a): "To effectuate the purposes of Title VII, any member of the Commission shall have the authority to sign and issue a subpoena requiring: ... (ii) the production of evidence including, but not limited to, books, records, correspondence, or documents, in the possession or under the control of the person subpoenaed; and (iii) access to evidence for the purposes of examination and the right to copy."

**3.** *Richard Brown v. New Orleans Clerks' and Checkers' Union, Local 1497*, CA 71–676, United States District Court, Eastern District of Louisiana.

**4.** *Charles Jett v. New Orleans Steamship Association*, CA–732252, United States District Court, Eastern District of Louisiana.

... or in any way act so as to deprive any individual of equal opportunity as a clerk or checker or otherwise adversely affect his status ... because ... of race."

A testing expert, Dr. Irving A. Fosberg, prepared a test which NOSSA and the union presented to the court for approval. After a hearing on June 12, 1978, during which the methodology of the examination was scrutinized, the court authorized its use.

In December of 1978, NOSSA scheduled the testing of 1,029 applicants for 50 available clerk and checker jobs. Dr. Fosberg had recommended that a score of 50 be considered passing during the first year of use of the new examination. Using this threshold, 607 applicants passed. The racial composition of this group was 322 whites and 285 blacks. NOSSA ranked the top 50 scores including ties, and invited 57 applicants to continue with job registration procedures. Fifty-three responded to the invitation and 50 were placed on the employment registration list, only one of whom was black.

In March of 1979, several individuals who had taken the examination but had not been selected filed charges with the EEOC, alleging race or sex[5] discrimination. The EEOC sought and received certain information from NOSSA. But two items were not furnished, a copy of the Fosberg test and a list of the applicants sitting for the December 1978 examination, reflecting name, race, and sex. This data was the object of the EEOC's subpoena *duces tecum*.[6]

NOSSA maintains that the 1975 consent decree in the *Brown/Jett* litigation resolved the discrimination issues the EEOC presently seeks to investigate. NOSSA argues that the investigation represents a collateral attack on the consent decree, that the subpoena is unduly burdensome, and that

the breakdown of the list of those taking the examination in December 1978 is not relevant to any matter appropriate for EEOC investigation. We do not agree.

### Collateral Attack

NOSSA contends that the EEOC investigation and subpoena effort simply is an attempt to re-open issues resolved by the 1975 consent decree. Accordingly, NOSSA suggests that the EEOC should be precluded from enforcing the subpoena on *res judicata* or collateral estoppel grounds. In support of this proposition, we are cited to our decision in *Truvillion v. King's Daughters Hospital*, 614 F.2d 520 (5th Cir. 1980). In *Truvillion* we observed that "the E.E.O.C. may not bring a second suit based on the transactions that were the subject of a prior suit by a private plaintiff, unless the E.E.O.C. seeks relief different from that sought by the individual." *Id.* at 525 (footnote omitted). A careful reading of Judge Wisdom's opinion, however, reflects that the *Truvillion* holding does not bar the investigation the EEOC has undertaken herein. Indeed, the discussion supports the proposition that the EEOC may challenge a transaction which was the subject of prior judicial scrutiny in a private suit, if the subsequent challenge seeks different relief.

The *Brown/Jett* litigation focused on claims of racial discrimination in the hiring of clerks and checkers as a consequence of NOSSA's use of preemployment testing techniques then in vogue. A new test resulted. From the record now before us, it appears that the present investigation was precipitated by allegations of racial and sexual discrimination caused by the ranking technique applied to those who achieved a passing grade on the December 1978 examination.[7] While facially similar, the issues apparently at the core of the present inves-

---

5. Ultimately, 30 persons filed charges—21 alleged racial discrimination, one alleged sexual discrimination, and eight alleged both.

6. The EEOC now seeks enforcement of the subpoena only as to the name, race, and gender of the December 1978 examinees.

7. The district court, in approving the Fosberg examination, did not concern itself with the validity of the test as a ranking device. Initially, the test was established only to determine "pass" or "fail," with 50 a passing score. In denying the enforcement of the EEOC's subpoena, the trial judge recognized this: "It is the *use* of the test—as a ranking device—that is

tigation are not the same as those addressed in the earlier litigation. Thus, the principles of *res judicata* are not applicable, *see, e.g., Jones v. Texas Tech Univ.*, 656 F.2d 1137 (5th Cir. 1981), nor are the concepts of collateral estoppel.[8]

### Relevance

■ Having concluded that neither the 1975 consent decree nor the judgment approving the use of the Fosberg test pose a threshold bar to the present EEOC investigation, we must determine whether the commission's subpoena request is reasonably related to that investigation. Mindful that it is for the agency, not the court, to determine the question of coverage in the first instance, regarding preliminary investigations into possible violations, *United States v. Morton Salt Co.*, 338 U.S. 632, 70 S.Ct. 357, 94 L.Ed. 401 (1950); *Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614 (1946); *New Orleans Public Serv., Inc. v. Brown*, 507 F.2d 160 (5th Cir. 1975), and that relevancy, at that stage, is to be interpreted expansively, *see Burns v. Thiokol Chem. Corp.*, 483 F.2d 300 (5th Cir. 1973); *Equal Employment Opportunity Comm'n v. University of New Mexico*, we conclude that the information sought is within the broad spectrum of relevance in this investigation In addition to the ranking dispute, the name, race, and sex information of the 1029 test examinees in December of 1978 is relevant in determining whether the test, as administered, adversely impacted on blacks or women. *See Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *Ensley*

*Branch of N.A.A.C.P. v. Seibels*, 616 F.2d 812 (5th Cir.) *cert. denied*, 449 U.S. 1061, 101 S.Ct. 784, 66 L.Ed.2d 603 (1980).

Finally, under the circumstances of this case, we find no merit in the suggestion that furnishing the information will prove unduly burdensome.

The order of the district court is REVERSED and the matter is REMANDED for enforcement of the subpoena *duces tecum* issued by the EEOC.

---

causing the problem." (Emphasis in original.) He further stated that "the record is silent on the ranking issue in terms of the ultimate selection process."

**8.** In *Truvillion* we noted the related doctrines within the *res judicata* aegis:

Two related doctrines are embraced by the term res judicata. The first, claim preclusion, prevents in a second action the adjudication of claims that were or could have been adjudicated in a prior action between the parties. The second action is said to be merged in the first judgment if the party wins, and barred if he loses. Restatement (Second) of Judgments, ch. 3 (Tent. Draft No.

1, 1973). The second doctrine, issue preclusion, or collateral estoppel, prevents in a second action the relitigation of fact or law that was decided in a previous action, on a perhaps unrelated claim, and that was necessary to the decision. *Id.* § 68. For discussion of the distinction see *Cromwell v. County of Sac*, 1876, 94 U.S. 351, 352–53, 24 L.Ed. 195; *Irving National Bank v. Law*, 2 Cir. 1926, 10 F.2d 721, 724 (L. Hand, J.).
614 F.2d at 523 n.6. Today, we confront issue preclusion because the alleged discrimination in the result ranking procedure utilized under the new test could not have been the subject of review in the *Brown/Jett* litigation.