EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,
Plaintiff,

v.

MCI TELECOMMUNICATIONS CORPORATION and MCI Communication Corporation, Defendants.

Civ. A. No. H–90–1540.

United States District Court,
S.D. Texas,
Houston Division.

May 3, 1993.

Olophius Perry, E.E.O.C., Houston, TX, for plaintiffs.

Kerry E. Notestine, Bracewell & Patterson, L.L.P., Houston, TX (Brian A. Schaffer, Washington, DC, of counsel), for defendants.

## FINAL JUDGMENT

HITTNER, District Judge.

As the Court has adopted the Memorandum and Recommendation of United States Magistrate Judge Crone (Document # 94) in the above reference matter, the Court

ORDERS that judgment be entered in favor of defendants MCI Telecommunications Corporation and MCI Communications Corporation (collectively "MCI"). Plaintiff, Equal Employment Opportunity Commission, takes nothing from MCI.

All relief not specifically granted herein is DENIED.

This is a FINAL JUDGMENT.

## MEMORANDUM AND RECOMMENDATION

CRONE, United States Magistrate Judge.

*Background.*

This is an employment discrimination case brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"). The plaintiff, Deborah Cox ("Cox"), claims that her employer, MCI Telecommunications Corporation ("MCIT") and its parent corporation, MCI Communications Corp. ("MCIC"), retaliated against her by discharging her because of her opposition to employment practices violative of Title VII.

MCIT and MCIC answered Cox's complaint, denying her claims for relief, alleging several affirmative defenses, and asserting counterclaims seeking attorney's fees. The parties tried the case to this court, sitting as a special master, on December 14–17, 1992. After considering the testimony, exhibits and arguments offered by the parties, this court submits its Recommended Findings of Fact and Conclusions of Law, as follows:

*Findings of Fact.*

1. Defendant MCIT is a communications company providing long distance telephone services to businesses and residences. MCIC is the parent corporation of MCIT. Cox was not employed by MCIC, but worked at all times for MCIT. MCIC and MCIT have separate human resource functions and different boards of directors. Both MCIT and MCIC are employers engaged in an industry affecting commerce within the meaning of Title VII.

2. Plaintiff Cox is a black adult female who was hired on March 3, 1980, as an Execunet Sales Representative at MCIT's Houston Business Center. "Execunet" was the name of the product offered by MCIT to commercial customers shortly after it commenced business in 1974. Jo Aman ("Aman"), the Sales Manager of the Houston Office, interviewed Cox and hired her. Aman, a white female, also served as Cox's direct supervisor at the time of Cox's hire. Later in 1980, Aman was promoted to the position of Houston Branch Manager by David Palmer, Sr., a black male.

3. Because of its success in selling services to residential customers, in mid–1980, MCIT changed its focus from commercial to residential sales. As a result, Aman made significant reductions in the commercial sales staff, retaining only Cox and two other former commercial sales representatives, one white and one black.

4. With the change in marketing focus, MCIT reorganized its Houston office and hired approximately fifty new sales people. Aman, as Branch Manager, had complete hiring authority for the Houston office. These positions were lower paid, in-bound sales representatives whose responsibilities

included taking sales orders over the telephone. This group of new hires was predominantly black.

5. From 1980 to October 1981, MCIT's Houston office experienced considerable growth in both increased sales and number of employees. Aman enlisted the aid of Cox in the hiring and training of the in-bound sales staff. By May of 1980, Cox devoted virtually all her efforts to interviewing applicants and training new hires.

6. During this time period, Aman and Cox had a good relationship. Cox performed well and worked closely with Aman.

7. In October, 1981, Aman left her position as Branch Manager to go on maternity leave. Cornell Hill ("Hill"), a black male, then became Branch Manager and Cox's supervisor. Palmer, the Director of Sales for Texas, made this assignment.

8. Under Hill, Cox received several promotions to supervisor and then manager. However, in September of 1983, Hill specifically noted in writing that Cox was having performance problems, particularly with ensuring that proper procedures were followed and with supervising others. Hill indicated that it was imperative that Cox correct her performance deficiencies immediately.

9. Aman returned to work in February 1982 after having been granted an extension of her maternity leave. Aman did not assume her prior position as Branch Manager, but instead worked part-time in a staff position for Palmer. In that capacity, Aman assisted Palmer in various assigned tasks.

10. In 1983, a Human Resources representative from the corporate office visited the Southwest Regional office. Palmer and Aman were among those in attendance. The Human Resources representative discussed with all of the managers the "percentages of population that needed to be hired." Aman understood the representative to say that the work force of MCIT's Houston office should mirror the racial demographics found within the Houston metropolitan area population.

11. In March or April of 1984, on Palmer's direction, Hill ceased being Branch Manager of the Houston office and relocated to the Dallas office to become its Branch Manager.

Aman resumed her duties as Branch Manager of the Houston office.

12. Aman understood that her role when she returned as Branch Manager was to take a hard look at everything going on, put some administrative controls in place, minimize and eliminate problems that were occurring, make sure office procedures were in order, and make sure employees and management were selling and installing what they were supposed to sell and install.

13. In April 1984, at a management meeting attended by Cox, and white males, Richard Sanders ("Sanders"), Charles Fick, and Vince DiBiase, Aman made a statement that she planned to change the color, or racial composition, of the office by hiring more whites, who were underutilized based on population statistics. Aman also commented that she wanted to make the office more professional. Aman was acting on what she perceived as directives of her superiors and the information provided by the 1983 visit by the Human Resources representative from the corporate office.

14. Cox misinterpreted Aman's comments to mean that Aman planned to fire blacks in order to make positions available for whites. Aman, however, never told Cox or any of her subordinates to discharge any black employees.

15. Cox expressed concerns about the meeting to Carol McAndrews ("McAndrews"), a white female Human Resources employee. Her concerns centered around posting job openings for advertising personnel. Aman had said that she wanted more professional, higher caliber employees than the current advertising staff. At the time, the advertising staff was all black.

16. McAndrews, who was out of town at the time, never informed Aman of Cox's concerns. Instead, McAndrews told Cox to call Chuck Shepherd ("Shepherd"), a black male Human Resources employee. Cox called Shepherd, who traveled to Houston to speak with Cox the day after the meeting.

17. Cox met Shepherd away from the office at a hotel because Cox did not want to be seen at the office speaking with him. Cox

never made any specific complaint to Shepherd about racial discrimination. Instead, Cox posed hypothetical questions to Shepherd as to what she should do if ordered to fire blacks for no reason and hire whites as replacements. Shepherd told Cox that such action would be illegal, but warned Cox that she could be in a dilemma because she could be charged with insubordination if she did not follow orders. Cox told Shepherd to keep their conversation in the strictest confidence. Shepherd honored Cox's request and did not discuss it with anyone.

18. Although Cox testified that she informed Aman about her impending meeting with Shepherd and her conversation with McAndrews, this Court finds her testimony not to be credible in light of Cox's insistence that the conversation with Shepherd be kept confidential. If she had already expressed concerns about racial discrimination to Aman or McAndrews, Cox would not have been so intent upon keeping her conversation with Shepherd a secret. Moreover, Cox subsequently had numerous opportunities to address this issue with Aman, Palmer and Joe Dane ("Dane"), a white male, who was in charge of Human Resources for the Southwest Region. Yet, Cox admitted that during meetings concerning her performance problems and her reviews, she never challenged or opposed Aman on race-related grounds. Moreover, none of Cox's written correspondence challenging her adverse performance ratings makes any reference to race discrimination or changing the color of the office. Instead, Cox turned to McAndrews and Shepherd, who in turn never informed Aman, Palmer, Dane or anyone involved in Cox's termination about any racial concerns that Cox might have had.

19. Aman had no master plan to fire blacks. Aman hired many of the blacks in the Houston office, including Cox. Cox asserted at trial that Aman ordered her to terminate Fred Harris ("Harris"), Dessie Lee ("Lee"), and Doreen Reeves ("Reeves") because of their race, black. However, Cox did not fire these employees nor did Aman, even though as Branch Manager she had the authority to do so. To the contrary, Aman promoted Harris and Lee in May 1984 (after the statement regarding changing the color of the office in April), and rated Harris and Reeves identically to the performance evaluations previously given by Hill.

20. Cox also admitted that despite her claim that Aman had a plan to change the color of the office, as far as she knew, Aman only terminated white employees, Sanders, Rita Sandberg ("Sandberg"), and Carole Gilbert, as late as four months after Aman returned as Branch Manager. There was no directive given by Aman to her subordinates to fire blacks or to hire non-black employees. Moreover, Aman terminated two managers, John Kelly ("Kelly") and Arnold Salinas ("Salinas"), white and hispanic males, for making racial slurs.

21. Cox testified that MCIT terminated her and other black and white employees because of their opposition to Aman's plan. However, the evidence showed that such alleged opposition had no bearing on continued employment. Michelle Burke, a black, and Craig MacBurnett, a white, were two employees whom Cox alleged were opposed to Aman's plan, yet they were not terminated. Conversely, Sanders, and Sandberg, both of whom were not black, were terminated by Aman even though they did not oppose her alleged plan. (Cox testified that these individuals were opposed to Aman's alleged plan. However, Sanders and Sandberg both testified that their termination had nothing to do with opposing employment practices based on race.)

22. The black hiring rate at the Houston branch office remained constant, and the percentage of blacks actually increased slightly during 1984. MCIT's EEO-1 reports, which track the racial makeup of the work force, showed that the percentage of blacks supervised by Aman actually went up during her tenure. Blacks always comprised more than half of the office and were well represented in managerial and supervisory positions.

23. Although Cox reasonably believed that Aman was attempting to engage in unlawful employment activity in April 1984, Cox did not express her opposition to what she perceived to be Aman's plan to anyone within the company. The only individuals to whom Cox expressed any concerns were McAn-

drews and Shepherd. While Cox testified that she discussed with McAndrews the posting of the advertising jobs, noticeably lacking was any testimony that she discussed with her the alleged plan to change the color of the office. McAndrews merely referred her to Shepherd, to whom Cox posed only hypothetical questions. Cox did not inform Shepherd of her belief that Aman wanted to change the racial composition of the office. After the passage of time and the events that unfolded, Cox's belief that Aman had a master plan to change the color of the office became unreasonable because no elements of such a plan ever came to fruition.

24. Aman's management style differed significantly from Hill's. Aman sought to install procedure and controls and eliminate what she perceived as performance problems. Aman "got down to nuts", was hands on and directly involved in subordinates' business. She wanted her subordinates "to inspect what you expect." Aman was autocratic and difficult to work for, but equally difficult for all races. Hill, on the other hand, had more of a laissez-faire approach and was popular with his subordinates. He rated 80% to 90% of his employees as "Excellent" or better, which management and the company Human Resources Department considered too liberal.

25. Cox performed well as a non-supervisory employee under Aman and as a supervisor and manager under Hill. However, when Aman returned as Branch Manager, Cox's management of her subordinates did not meet Aman's expectations. Aman's evaluation of Cox's problems included improper administrative procedures and controls, faulty financial reports and expense forms, refusal to address poor performance by subordinates, and refusal to follow specific instructions. Cox also failed to ensure that delegated tasks were completed fully and on time.

26. Aman attempted to work with Cox, to point out performance deficiencies and to get her to manage her employees more closely, to follow-up on things, and to take an objective look at her subordinates' strengths and weaknesses. Cox did not "inspect what you expect." She failed to follow-up on a number of things she was requested to do. Cox admitted that she did not do several specific tasks requested by Aman.

27. Cox was defensive, non-responsive, and uncooperative in response to Aman's suggestions and questions. However, she never mentioned any concerns about race discrimination or retaliation.

28. In August, 1984, Aman rated Cox's performance on her six-month review as "Improvement Required." In addition, Aman presented Cox with a letter of probation outlining the specific areas in which Cox had to improve. This included an audit of every department under her supervision to determine if proper procedures and controls were in place and a written performance review of every person directly reporting to Cox. Cox was unhappy with the review, refused to sign it or the letter of probation, and told Aman she would submit a written response.

29. On August 28, 1984, Cox outlined her complaints in writing to Aman. Cox's basic theme was that Aman's criticism was unacceptable and without merit. Once again, Cox never mentioned any concerns about race discrimination or retaliation.

30. On September 4, 1984, after consideration of Cox's remarks, Aman reaffirmed the review and letter, and requested again that Cox complete the audit of her group. Cox never did any of these assignments given to her by Aman.

31. Cox appealed to corporate Human Resources, who directed her to consult with Palmer. On October 1, 1984, Cox met with Palmer and Dane. Cox stated her disagreements with Aman's review and assignments. Again, Cox did not mention either discrimination or retaliation. Palmer and Dane agreed that Cox's performance would be reevaluated. Palmer and Dane told Cox, however, that she had to comply with all the terms of the letter of probation and cooperate with Aman. Aman kept Palmer apprised of the counseling of Cox, and Palmer supported Aman's handling of Cox's performance problems.

32. On October 10, Aman met with Cox and presented her with a revised review, which increased Cox's overall rating one level to

"Generally Good." Aman, however, continued to stress that the audits and performance reviews of Cox's employees still had to be completed. Cox understood that it was her obligation to do her assigned tasks, but she never complied with those obligations, even though she believed her job was in jeopardy. Again, Cox did not raise any objection to the performance appraisal as being based on race or retaliation.

33. In mid-October, Cox approached Aman with a proposal that she would resign for five months severance pay. This was not the customary practice at MCIT; three months severance pay was the norm. Aman, however, discussed Cox's request with Palmer and Dane, who rejected the offer but authorized Aman to offer Cox the standard three months of severance pay in exchange for her resignation. Cox did not immediately respond or make any decision for more than a week. In the meantime, even though she recognized her job was on the line, Cox continued to neglect her duties and disobeyed Aman's direct instructions.

34. On October 26, 1984, Aman decided that the situation could no longer continue. Cox had to do her job, accept the standard severance package for her resignation, or be fired. In a meeting that day between Cox and Aman, Cox would not commit to doing her job or resigning. Cox had not even begun to comply with the terms of her probation letter. Aman, therefore, terminated Cox's employment. Cox's discharge was approved by Palmer and Dane. Nonetheless, MCIT provided Cox with three months of severance pay.

35. Aman replaced Cox with Malcomb Gardner, a black male.

36. After Cox's termination, she actively sought work. Cox registered with M. David Lowe's sales and management offices and similar companies for employment referrals. Cox also pursued employment by responding to newspaper advertisements and by asking friends for leads. She attempted a self-employment, construction venture but because of the poor economy at the time, the venture ultimately failed. Cox subsequently obtained a sales job with Ericsson G.E. Mobil Communications. Thus, Cox exercised reasonable care and diligence in seeking employment after her discharge from MCIT in an effort to mitigate her damages.

37. Aman did not discharge Cox in retaliation for Cox expressing opposition to what she believed to be an unlawful employment practice or because of her race. Aman discharged Cox for legitimate non-discriminatory business reasons. These conclusions are supported by the witnesses in the case who testified that Aman was not a racist, they knew of no reason other than performance issues for Cox's termination, and they never saw nor had any information that Aman made an employment decision based on race or other unlawful motive.

38. There is no causal connection between Cox's expression of her concerns and Aman's discharge of Cox. Aman's remark about changing the color of the office was a stray remark. It was not related to the employment decision challenged, nor was it close in time to Cox's discharge.

39. The issue at stake in this case, retaliation, was not at stake in *Reeves v. MCI Telecommunications Corp.*, H–90–580 (S.D.Tex. June 3, 1991), a race discrimination case. The question of whether Cox was retaliated against because of her opposition to certain employment practices at MCIT was neither litigated nor determined in the *Reeves* case. The EEOC neither succeeded to Reeves' property interest, controlled the *Reeves* litigation, nor was its interests in this lawsuit adequately represented in the *Reeves* suit. Although the cases may have some subsidiary fact issues in common, the standards for collateral estoppel have not been met.

40. The EEOC's claims as to Cox are not entirely frivolous, unreasonable, or without foundation. The EEOC did not bring this lawsuit in bad faith.

*Conclusions of Law.*

1. This court has jurisdiction over the parties and the subject matter of this case.

2. Under Title VII, an employment relationship is a prerequisite to maintaining an action. 42 U.S.C. § 2000e(b).

Four factors, with the second factor being most important, are considered in determining whether a parent company will be held liable for the actions of its subsidiary: (1) interrelation of operations; (2) centralized control of labor relations; (3) common management; and (4) common ownership or financial control. *Chaiffetz v. Robertson Research Holding, Ltd.*, 798 F.2d 731, 735 (5th Cir.1986); *Trevino v. Celanese Corp.*, 701 F.2d 397, 404 (5th Cir.1983). The testimony at trial demonstrates that Cox was employed by MCIT, not MCIC. While MCIC is the parent company of MCIT, they have different boards of directors and separate human resource functions; there is no centralized control of labor relations. Therefore, in this case, MCIC is not an appropriate defendant; only MCIT is a proper defendant.

3. MCIT contends that this lawsuit is barred by the doctrine of collateral estoppel due to a judgment entered in favor of MCI in *Reeves v. MCI Telecommunications Corp.*, H–90–580 (S.D.Tex. June 3, 1991). MCIT, however, has not satisfied the criteria for applying collateral estoppel in the instant case.

■■■ 4. The doctrine of collateral estoppel gives preclusive effect to factual issues resolved in a former suit when: 1) the factual issues currently in dispute are identical to the ones involved in the prior litigation; (2) the factual issue was actually litigated in the prior action; and (3) the determination of the factual issue in the prior case was critical and necessary to the judgment in the earlier decision. *Meza v. General Battery Corp.*, 908 F.2d 1262, 1273 (5th Cir.1990). Collateral estoppel operates as a complete bar to the subsequent action when the factual issues that are precluded from relitigation are determinative of the matter in controversy in a later suit even if the two suits were based on different causes of action. *Eubanks v. Getty Oil Co.*, 896 F.2d 960, 963 (5th Cir.1990). Because MCIT seeks to bind the EEOC to a judgment in *Reeves*, to which the Commission was not a party, MCIT must also show that: (1) the EEOC succeeded to Reeves' property interest; (2) the EEOC controlled the *Reeves* litigation; or (3) the EEOC's interests in this lawsuit were adequately represented in the *Reeves* suit. *Terrell v. De Conna*, 877 F.2d 1267, 1270 (5th Cir.1989). Because the EEOC seeks to vindicate the public interest, which is broader than the interests of private litigants, it generally is not bound by the failure of private plaintiffs to prevail in litigation and is not precluded from maintaining an independent action. *See New Orleans S.S. Ass'n v. EEOC*, 680 F.2d 23, 25 (5th Cir.1982); *Truvillion v. King's Daughters Hospital*, 614 F.2d 520, 525 (5th Cir.1980); *EEOC v. Huttig Sash & Door Co.*, 511 F.2d 453, 455–56 (5th Cir.1975); *EEOC v. Kimberly–Clark*, 511 F.2d 1352, 1361 (6th Cir.1975), *cert. denied*, 423 U.S. 994, 96 S.Ct. 420, 46 L.Ed.2d 368 (1975).

■ 5. In the instant case, MCIT cannot show that the factual issues necessary to prove the Commission's Section 704(a) "opposition" law suit are the identical factual issues adjudicated in Reeves' Section 703(a) "discrimination" law suit. This is because in the *Reeves* case the plaintiff had to prove discrimination, whereas, in the instant case, the EEOC must prove retaliation. Establishing a *prima facie* case that an individual was discharged because of her race involves distinctly different criteria from showing a *prima facie* case that an individual was discharged because of her opposition to an unlawful employment practice.

■ ■ 6. When racially discriminatory discharge is asserted, a *prima facie* case is established when a plaintiff shows she is a member of a protected class who, despite her qualifications, was discharged and replaced with a nonminority. *Jackson v. City of Killeen*, 654 F.2d 1181, 1183 (5th Cir.1981). When opposition is asserted, a *prima facie* case is established when a plaintiff shows opposition to unlawful employment practices, an adverse employment action, and a causal link between the opposition and the adverse employment action. *Payne v. McLemore's Wholesale & Retail Stores*, 654 F.2d 1130, 1140 (5th Cir.1981). Moreover, an opposition plaintiff need only show "that she had a reasonable belief that the employer was engaged in unlawful employment practices." *Id.* A discrimination plaintiff, on the other hand, must show that unlawful employment practices actually existed. Thus, proving the

**308**

existence of MCIT's plan to change the color of the office was required in the *Reeves* case, while in the instant case, such proof is not essential to the establishment of the EEOC's case.

7. Similarly, MCIT cannot satisfy prongs two and three of the collateral estoppel test: the adjudication in *Reeves* of whether Cox was discharged because of her opposition to unlawful employment practices and whether the legality of Cox's discharge was a critical and necessary element of the judgment in *Reeves*. As noted above, the proof requirements in *Reeves* were fundamentally different from those in this case. *Reeves* never adjudicated the issue whether Cox had a reasonable belief that a plan to change the color of the office existed. Moreover, MCIT has not shown that the EEOC's interest under Title VII of preventing retaliatory discharges was adequately represented by the private plaintiff in *Reeves;* retaliation simply was not at issue in *Reeves.* Furthermore, MCIT has not established that the doctrine of collateral estoppel applies to the EEOC in its capacity as an agent of the United States. *See United States v. Baton Rouge Parish School Bd.,* 594 F.2d 56, 58–59 (5th Cir.1979). Thus, MCIT's collateral estoppel argument fails.

8. There is no credible evidence to support a finding that MCIT retaliated against Cox because of her race in violation of Title VII of the Civil Rights Acts of 1964, 42 U.S.C. § 2000e–3(a). The EEOC has failed to establish a *prima facie* case of unlawful retaliation.

9. Title VII of the Civil Rights Act of 1964 prohibits covered employers from retaliating against persons who oppose unlawful employment practices and those who file a charge or participate in any proceedings taken for the purpose of enforcing the statute. 42 U.S.C. § 2000e–3(a). To establish a *prima facie* case of unlawful retaliation in a termination, the plaintiff must prove the following elements by a preponderance of the evidence: (1) that the plaintiff opposed an unlawful activity or reasonably believed that the activity was unlawful under Title VII; (2) an adverse employment action occurred; and (3) there was a causal connection between the opposition and the adverse employment decision. *Hamilton v. Rodgers,* 791 F.2d 439, 441–42 (5th Cir.1986).

10. Here, the EEOC failed to establish that Cox opposed an unlawful activity or an activity she reasonably believed to be unlawful. Cox did not express opposition to what she perceived to be unlawful employment activity, Aman's announced plan to change the racial composition of the office. The only persons with whom Cox expressed any concerns were McAndrews and Shepherd. However, Cox's discussions with McAndrews focused upon the posting of advertising jobs. Cox posed only broad hypotheticals to Shepherd, and, at Cox's request, he did not discuss the matter with anyone else in the company. Cox further admitted that she did not complain to Palmer or Dane that Aman's actions were based on racial or retaliatory motives. Finally, there is no evidence, other than Cox's testimony, which this Court finds not to be credible in view of her insistence on Shepherd's secrecy, that Aman, the person who terminated Cox, knew Cox was opposing any perceived unlawful practice. Certainly, retaliation is not possible if the decisionmaker is unaware of any opposition.

11. The EEOC must also show that Cox's opposition to unlawful activity was the motivating and determinative factor in her termination, *i.e.,* it must demonstrate a causal connection. *Jack v. Texas Research Center,* 743 F.2d 1129, 1131 (5th Cir.1984); *McMillan v. Rust,* 710 F.2d 1112, 1116 (5th Cir. 1983). As addressed above, the EEOC failed to establish that Cox opposed what she reasonably believed to be unlawful conduct by Aman. Moreover, even if the EEOC established that Cox opposed Aman's plan, it failed to establish a causal connection between Cox's alleged opposition and her termination. None of the persons involved in Cox's termination had any inkling that Cox had opposed any employment practices because she believed them to be racially discriminatory. The evidence at trial demonstrated that Cox's termination occurred for legitimate business reasons irrespective of race or any purported opposition to unlawful activity.

12. Cox testified that MCIT terminated her and other black and white employees because of their opposition to Aman's unlawful practices. The evidence, however, conclusively shows that terminations occurred regardless of race or any purported opposition to unlawful activity, thereby confirming EEOC's failure to establish a causal connection between protected activity and an adverse employment action.

13. As mentioned above, the EEOC has not established a *prima facie* case of retaliatory discharge because it failed to prove that Cox expressed opposition to Aman's alleged unlawful employment practices and failed to establish any causal connection between the supposed opposition and Cox's termination. Moreover, assuming the EEOC did establish a *prima facie* case, it failed to demonstrate that MCIT's non-retaliatory business reason for terminating Cox was a pretext for discrimination.

■ 14. When a plaintiff establishes a *prima facie* showing of retaliatory discharge, the employer bears only the burden of articulating a non-discriminatory business reason for its action to rebut the *prima facie* case. However, the burden of proving intentional unlawful retaliation always remains with the plaintiff. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253–56, 101 S.Ct. 1089, 1093–95, 67 L.Ed.2d 207 (1980). Once the employer articulates a non-retaliatory reason, thereby rebutting the plaintiff's initial evidence, the plaintiff then must prove by a preponderance of the evidence that the employer's stated reason for its action was a pretext. This intent standard further requires that retaliation be the determining factor in the defendant's decision to take adverse employment actions against the plaintiff. *Los Angeles Department of Water v. Manhart*, 435 U.S. 702, 711, 98 S.Ct. 1370, 1377, 55 L.Ed.2d 657 (1978). Moreover, the discrimination and retaliation laws were not intended to be vehicles for judicial second guessing of employment decisions, nor were they intended to transform the courts into personnel managers. *Bienkowski v. American Airlines, Inc.*, 851 F.2d 1503, 1507–08 (5th Cir.1988). The soundness of the defendant's business judgment is irrelevant in determining whether it was motivated by retaliatory factors. Thus, even if the defendant's conduct and reasoning do not seem appropriate, as long as the defendant's decision was not based on discriminatory or retaliatory motives, it is not proscribed by Title VII. *Id.* at 1507.

15. In the instant case, MCIT has demonstrated that Cox's termination was not retaliatory but was based on her well-documented performance problems dating from September 1983 to August 1984. Cox was given numerous opportunities to ameliorate her performance after her August review of "Improvement Required." Yet, Cox, by her own admission, did not cooperate with Aman nor did she heed Palmer or Dane's advice. Moreover, Cox failed to give Aman any indication that she was trying or even willing to get her performance up to par. These are legitimate, non-retaliatory reasons for Cox's termination.

■ 16. The EEOC cannot use Aman's statements regarding changing the color of the office to support its retaliation claim. When discriminatory comments are vague and remote in time and administrative hierarchy, they are no more than "stray remarks," insufficient to establish a pretext to discriminate or retaliate. *Guthrie v. Tifco Indus.*, 941 F.2d 374, 379 (5th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1267, 117 L.Ed.2d 495 (1992). To rise above the level of a stray remark and constitute direct evidence of discrimination, a remark must: (1) be made by the decision maker or one whose recommendation is sought by the decision maker; (2) be related to the specific employment decision challenged; and (3) be made close in time to the decision. *Turner v. North American Rubber, Inc.*, 979 F.2d 55, 59 (5th Cir.1992).

17. In the instant case, Cox construed Aman's remark about changing the color of the office to mean that Aman intended to terminate black employees and replace them with whites. However, the evidence does not support this interpretation. Cox's testimony that Aman asked her to fire three black employees, Harris, Lee and Reeves, was not credible because Aman did not fire those employees. Instead, Aman gave Harris and

Lee promotions and gave Reeves a "Very Good" performance rating. Moreover, by the time Cox was terminated, the only other employees who had been terminated were white.

18. The EEOC offered Sanders' unadopted affidavit, which stated that Aman made reference to a need to hire more whites. Aman and Palmer testified about the need to correct underutilization of hispanics by expanding the applicant flow of hispanics. Thus, Aman's comments about changing the color of the office related to hiring and not firing practices. Since Cox is claiming an unlawful termination decision, not an unlawful hiring decision, Aman's alleged comment cannot relate to the employment decision in question.

19. Additionally, the EEOC cannot establish that Aman's comment was made close in time to Cox's termination. Aman made the comment in April, 1984. Cox testified to no similar comments made after that time. However, Cox's discharge did not occur until late October, after six months of repeated and documented performance deficiencies. Therefore, the alleged comment was not close in time and was not causally connected to Cox's termination.

20. Finally, the Supreme Court has stated that remarks at work relating to a protected group do not inevitably prove that an illegitimate factor played a part in a particular employment decision. The plaintiff must show that the employer actually relied on the illegitimate factor in making its decision. *Price Waterhouse v. Hopkins,* 490 U.S. 228, 251, 109 S.Ct. 1775, 1791, 104 L.Ed.2d 268 (1989). In essence, Cox must establish a nexus between the statements made and the termination decision to demonstrate that unlawful retaliation was a substantial factor in Cox's termination. *See Smith v. Firestone Tire & Rubber Co.,* 875 F.2d 1325, 1330 (7th Cir.1989). Cox has failed to establish that nexus because the alleged remark at issue was not part of MCIT's decision-making process. As a result, this comment cannot constitute direct evidence of MCIT's intent to retaliate against Cox or evidence of pretext.

21. The EEOC has not proven that any violation of Title VII occurred in connection with Cox's discharge. Therefore, the EEOC is not entitled to any remedy in this case.

22. Title VII incorporates the traditional mitigation of damages rule into its remedies provision, which imposes upon the complaining party a duty to mitigate damages by being reasonably diligent in seeking employment substantially equivalent to the position lost. *Ford Motor Company v. EEOC,* 458 U.S. 219, 231–32, 102 S.Ct. 3057, 3065–66, 73 L.Ed.2d 721 (1982). A plaintiff exhibits reasonable diligence in her duty to mitigate when she seeks employment in positions different from those formerly held, including self-employment. *Hansard v. Pepsi–Cola Metropolitan Bottling Co.,* 865 F.2d 1461, 1468 (5th Cir.1989); *Peel v. Florida Dept. of Transportation,* 500 F.Supp. 526, 528 (N.D.Fla.1980). Cox's testimony and other evidence submitted to the court satisfied the EEOC's burden of demonstrating that Cox mitigated her damages by seeking and securing other employment.

23. With respect to MCIT's and MCIC's claims for attorney's fees, defendants must not only prevail, but must show that the EEOC's action was frivolous, unreasonable, or without foundation, or that is was brought in bad faith. *Christiansburg Garment Co. v. EEOC,* 434 U.S. 412, 421, 98 S.Ct. 694, 700, 54 L.Ed.2d 648 (1978). MCIT and MCIC have not established any of these factors. Accordingly, defendants are not entitled to an award of attorney's fees.

24. Any conclusion of law more properly characterized as a finding of fact is hereby adopted as such. Any finding of fact more properly characterized as a conclusion of law is hereby adopted as such.

*Conclusion.*

For the foregoing reasons, this court RECOMMENDS that plaintiff take nothing and judgment be entered for defendants with each party to bear its own costs.

The Clerk shall file this instrument and mail a copy to all parties. Within ten days after being served with a copy, any party may file written objections. Failure to file objections to this memorandum and recommendation bars attack on the factual findings

on appeal. The original of any written objections shall be filed with the U.S. District Clerk, P.O. Box 61010, Houston, Texas 77208–1010. Copies of the objections must be mailed to the opposing parties and to the chambers of the magistrate judge, P.O. Box 610070, Houston, Texas 77208.

SIGNED on January 29, 1993, at Houston, Texas.